# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PENNSYLVANIA PROFESSIONAL** | : | **CIVIL ACTION NO. 1:18-CV-1308** |
| **LIABILITY JOINT UNDERWRITING** | : | |
| **ASSOCIATION,** | : | **(Chief Judge Conner)** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **TOM WOLF, in his Official Capacity** | : | |
| **as Governor of the Commonwealth of** | : | |
| **Pennsylvania,** *et al.*, | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM

On May 17, 2018, this court entered judgment in <u>Pennsylvania Professional

Liability Joint Underwriting Ass'n v. Wolf</u> ("<u>JUA I</u>"), No. 1:17-CV-2041, 2018 WL

2263549, __ F. Supp. 3d __ (M.D. Pa. 2018), declaring portions of Act 44 of 2017, P.L.

725, No. 44 ("Act 44") to be violative of the Takings Clause of the Fifth Amendment

to the United States Constitution.  We held therein that, by virtue of the breadth of

its enabling legislation, the Pennsylvania Professional Liability Joint Underwriting

Association ("Joint Underwriting Association" or "Association") is a private entity,

its assets are private property, and the Commonwealth thus cannot expropriate the

surplus funds held in the Association's coffers.  We permanently enjoined the

Commonwealth from enforcing the legislation.

Act 41 of 2018, No. 41, 2018 Pa. Laws __ (June 22, 2018) ("Act 41"), is the

General Assembly's answer to <u>JUA I</u>.  Utilizing our earlier analysis as a blueprint,

Act 41 endeavors to avoid the constitutional infirmities of Act 44.  Specifically, it

purports to, *inter alia*, fold the nonprofit Joint Underwriting Association into the Commonwealth's Insurance Department ("Department"), shift control of the Association from its current member-led board to a board comprised of political appointees, oust the Association's president in favor of a new executive director hired by the Commonwealth's Insurance Commissioner ("Commissioner"), and mandate transfer of all of the Association's documents, files, and assets to the Department within 30 days of the Act's effective date. The Association asks the court to enjoin enforcement of the operative provisions of Act 41.

## I.    **Background**

The Joint Underwriting Association commenced this lawsuit with the filing of a verified complaint on June 28, 2018, subsequently filing an amended complaint on July 3, 2018. Therein, the Association challenges the constitutionality of Act 41 under 42 U.S.C. § 1983. The Association asserts that Act 41 violates the Substantive Due Process Clause (Count I), the Takings Clause (Count II), and the Contract Clause (Count III), and seeks declaratory and injunctive relief pursuant to Section 1983 and the Declaratory Judgment Act, 28 U.S.C. § 2201 (Count IV). The Association identifies as defendants Tom Wolf, Governor of the Commonwealth; the General Assembly of the Commonwealth; the elected leadership of both chambers of the General Assembly; and Jessica K. Altman, Insurance Commissioner of Pennsylvania. All defendants are sued in their respective official capacities.[1]

---

[1] Counsel have entered their appearances on behalf of Governor Wolf, Commissioner Altman, and the elected leadership of both chambers of the General Assembly. Counsel has not yet entered an appearance on behalf of the General Assembly itself.

The Association moved for a temporary restraining order and preliminary injunction contemporaneously with the commencement of this case. The court denied the request for temporary restraining order and expedited proceedings on the request for a preliminary injunction. The court heard argument on the Association's motion on July 6, 2018. The parties agreed during oral argument that, for purposes of resolving the Association's motion, the factual record developed in JUA I is stipulated into the record *sub judice*. Accordingly, the findings of fact that follow are adopted from the court's summary judgment opinion in JUA I, with emphasis and reiteration of the facts most pertinent to the Association's instant claims.

## II.  Findings of Fact

The Joint Underwriting Association is a nonprofit association organized under the laws of the Commonwealth of Pennsylvania. See JUA I, 2018 WL 2263549, at *1. The General Assembly created the Association in 1975 in response to a "hard market" for medical malpractice insurance in the Commonwealth. Id. The Association was initially established and organized by the Pennsylvania Health Care Services Malpractice Act of 1975, P.L. 390, No. 111 ("Act 111"). The General Assembly repealed Act 111 on March 20, 2002, replacing it with the Medical Care Availability and Reduction of Error Act ("MCARE Act"), 40 PA. STAT. & CONS. STAT. ANN. § 1303.101 *et seq*.

### A.    The MCARE Act and the Joint Underwriting Association

The MCARE Act is a sweeping piece of legislation, with an overarching goal of ensuring a "comprehensive and high-quality health care system" for the

citizens of the Commonwealth.  Id. § 1303.102(1).  Among other things, the MCARE Act established the Medical Care Availability and Reduction of Error Fund ("the MCARE Fund").  See id. §§ 1303.711-.716.  The General Assembly designed the MCARE Fund as a "special fund" within the state treasury to be administered by the Department.  Id. §§ 1303.712(a), -.713(a).  The Fund provides a secondary layer of medical professional liability coverage for physicians, hospitals, and other health care providers in the Commonwealth.  See id. § 1303.711(g).  It is funded primarily by annual assessments on health care providers as a condition of practicing in the Commonwealth.  See id. § 1303.712(d)(1).

The MCARE Act continues the operation of the Joint Underwriting Association.  Id. § 1303.731(a).  Unlike the MCARE Fund, the General Assembly did not establish the Association as a "special fund" or a traditional agency within the Commonwealth's governmental structures.  See id.; cf. id. §§ 1303.712(a), -.713(a). Instead, the General Assembly "established" the Association as "a nonprofit joint underwriting association to be known as the Pennsylvania Professional Liability Joint Underwriting Association."  Id. § 1303.731(a).  Like its predecessor, see Act 111, § 802, the MCARE Act mandates membership in the Association for insurers authorized to write medical professional liability insurance in the Commonwealth, 40 PA. STAT. & CONS. STAT. ANN. § 1303.731(a).

The MCARE Act requires the Association to offer medical professional liability insurance to health care providers and entities who "cannot conveniently obtain medical professional liability insurance through ordinary methods at rates not in excess of" rates applicable to those similarly situated.  Id. § 1303.732(a).  The

4

Act sets forth broad parameters for achieving this objective, tasking the Association to ensure that its insurance is conveniently and expeditiously available, offered on reasonable and not unfairly discriminatory terms, and subject only to the payment of a premium for which payment plans must be made available. Id. § 1303.732(b)(1)-(5).

The Association, like other insurers in the Commonwealth, is "supervised" by the Department through the Commissioner. Id. § 1303.731(a); see, e.g., id. §§ 221.1-a to -.15-a, 1181-99. The MCARE Act prescribes four "duties" to the Association. Id. § 1303.731(b). It requires the Association to (1) submit a plan of operations to the Commissioner for approval, (2) submit rates and any rate modifications for Department approval, (3) offer insurance as described *supra*, and (4) file its schedule of occurrence rates with the Commissioner. See id. § 1303.731(b)(1)-(4). Prior to enactment of Act 41, the MCARE Act insulated the Commonwealth from the Association's debts and liabilities. See id. § 1303.731(c).

The MCARE Act provides that all "powers and duties" of the Association "shall be vested in and exercised by a board of directors." Id. § 1303.731(a). The board's composition, and all of the Association's operative principles, are set forth in a plan of operations developed by the Association with Department assistance and approval. See JUA I, 2018 WL 2263549, at *3. The existing plan establishes a 14-member board of directors, which consists of the current Association president; eight representatives of member companies chosen by member voting; one agent or broker elected by members; and four health care provider or general public representatives who may be nominated by anyone and are appointed by the

Commissioner. Id. Under the plan, the Association may be dissolved (1) "by operation of law," or (2) at the request of its members, subject to Commissioner approval. Id. The plan further provides that, "[u]pon dissolution, all assets of the Association, from whatever source, shall be distributed in such manner as the Board may determine subject to the approval of the Commissioner." Id.

The Joint Underwriting Association writes insurance policies directly to its insured health care providers, and those policyholders pay premiums directly to the Association. Id. The Association is funded exclusively by policyholder premiums and any investment income generated therefrom. Id. It is not and has never been funded by the Commonwealth, and it holds all premiums and investment funds in private accounts in its own name. Id.

The Association maintains contingency funds—its "reserves" and its "surplus"—which allow the Association to fulfill its insurance obligations in the event of greater-than-anticipated claims or losses. Id. An insurer's "reserves" are the "best estimate of funds . . . need[ed] to pay for claims that have been incurred but not yet paid." Id. Its "surplus" represents "capital after all liabilities have been deducted from assets." Id. The surplus operates as a "backstop" to ensure that unforeseen events do not impede an insurer's ability to meet obligations to its insureds. Id. As of December 31, 2016, the Joint Underwriting Association maintained a surplus of approximately $268,124,500. Id.

## B.   Act 85 of 2016

On July 13, 2016, Governor Wolf signed into law Act 85 of 2016, P.L. 664, No. 85 ("Act 85"). Act 85 is wide-ranging in scope, but its principal effect was to

amend the General Appropriation Act of 2016 and balance the Commonwealth's budget. Act 85, § 1. Among other things, Act 85 provides for certain transfers to the Commonwealth's General Fund. See id. § 1(7). Pertinent here, Section 18 of Act 85 amends the Commonwealth's Fiscal Code to require a $200,000,000 transfer to the General Fund from the Joint Underwriting Association, repayable "over a five-year period commencing July 1, 2018." Id. § 18.

The Association did not transfer funds to the Commonwealth pursuant to Act 85. On May 18, 2017, the Association commenced a lawsuit, also pending before the undersigned, challenging the constitutionality of Act 85. See Pa. Prof'l Liab. Joint Underwriting Ass'n v. Albright, No. 1:17-CV-886, Doc. 1 (M.D. Pa. May 18, 2017). The lawsuit names Randy Albright in his official capacity as the Commonwealth's Secretary of the Budget as the sole defendant. At the parties' request, that litigation has been held in abeyance pending resolution of appeals filed in JUA I.

### C.    Act 44 of 2017

Governor Wolf signed Act 44 into law on October 30, 2017, in another attempt to bring balance to the state budget. Act 44, § 1. Therein, the General Assembly expressly repeals Act 85. Id. § 13. Act 44, *inter alia*, amends the Fiscal Code to include certain "findings" concerning the Joint Underwriting Association's relationship to the Commonwealth and the nature of its unappropriated surplus. Id. § 1.3. Among other things, the General Assembly "finds" in Act 44 that the Joint Underwriting Association is an "instrumentality of the Commonwealth" and its monies "belong[] to the Commonwealth." Id. Act 44 then mandates a monetary

transfer from the Association to the Commonwealth—"$200,000,000 to the State Treasurer for deposit into the General Fund"—for appropriation by the General Assembly to the Department of Human Services.  Id.  Act 44 contains a "sunset clause" threatening to abolish the Association if it fails to make the transfer.  Id.

The Association responded with a second lawsuit, JUA I, challenging the constitutionality of Act 44.  We preliminarily enjoined enforcement of Act 44 and accelerated proceedings on the merits of the Association's claims.  On May 17, 2018, we issued a memorandum opinion concluding that the Association is a private entity and its surplus funds are private property that the Commonwealth cannot take without just compensation.  JUA I, 2018 WL 2263549, at *14.  We entered judgment in favor of the Association declaring Act 44 to be violative of the Fifth Amendment and permanently enjoined enforcement of the provisions thereof relevant to the Association.  Both the Commonwealth and the General Assembly appealed our judgment to the Third Circuit Court of Appeals.  See Pa. Prof'l Liability Joint Underwriting Ass'n v. Wolf, No. 18-2323 (3d Cir.).  Their appeals remain pending.

### D.  Act 41 of 2018

On June 22, 2018, Governor Wolf signed Act 41 into law.  Act 41 radically reshapes the Joint Underwriting Association and alters its governance structure to give the Commonwealth direct control of the Association's assets and operations.  See Act 41, §§ 3-5.  Specifically, Act 41 does the following:

(1)     Finds that "placing the Association within the Department will give the Commissioner more oversight of expenditures and ensure better efficiencies in the operation of the Association";

(2) Declares that the Association "shall continue as an instrumentality of the Commonwealth" and "shall operate under the control, direction and oversight of the Department";

(3) Replaces the Association's current member-led board with a state-controlled board, consisting of three gubernatorial appointees and one member appointed by each of the president *pro tempore* and the minority leader of the Pennsylvania Senate and the speaker and the minority leader of the Pennsylvania House of Representatives, with the chair of the board to be appointed by the Governor;

(4) Installs a new executive director to be hired by the Commissioner and compensated by the Commonwealth, to whom authority to act on behalf of the Association will be transferred within 30 days of the Act's effective date;

(5) Assumes Commonwealth liability for any claims or liabilities of the Association arising under its insurance policies;

(6) Mandates that the new board prepare and submit a new plan of operations to the Commissioner for approval within 60 days of the Act's effective date;

(7) Articulates with specificity the duties and responsibilities of and the authority granted to the new board; and

(8) Provides that all documents, papers, and assets in the Association's possession shall be transferred to the Department within 30 days of the Act's effective date.

Id. § 3. Act 41 takes effect on July 22, 2018. Id. § 7.

## III. <u>Legal Standard</u>

The court applies a four-factor test in determining the propriety of preliminary injunctive relief. The movant must, as a threshold matter, establish the two "most critical" factors: likelihood of success on the merits and irreparable harm. <u>Reilly v. City of Harrisburg</u>, 858 F.3d 173, 179 (3d Cir. 2017). Under the first factor, the movant must show that "it can win on the merits." <u>Id.</u> This showing

must be "significantly better than negligible but not necessarily more likely than not." Id. The second factor carries a slightly enhanced burden: the movant must establish that it is "more likely than not" to suffer irreparable harm absent the requested relief. Id. Only if these "gateway factors" are satisfied may the court consider the third and fourth factors: the potential for harm to others if relief is granted, and whether the public interest favors injunctive relief. Id. at 176, 179. The court must then balance all four factors to determine, in its discretion, whether the circumstances favor injunctive relief. Id. at 179.

## IV. Discussion

### A. *Likelihood of Success on the Merits*

To establish a likelihood of success on the merits, a movant must produce sufficient evidence to satisfy the essential elements of the underlying cause of action. See Punnett v. Carter, 621 F.2d 578, 582-83 (3d Cir. 1980). We must examine the legal principles controlling the claim and the potential defenses available to the opposing party. See BP Chems. Ltd. v. Formosa Chem. & Fibre Corp., 229 F.3d 254, 264 (3d Cir. 2000). A mere possibility that the claim might be defeated does not preclude a finding of probable success if evidence clearly satisfies the essential prerequisites of the cause of action. Highmark, Inc. v. UPMC Health Plan, Inc., 276 F.3d 160, 173 (3d Cir. 2001). A showing that is "significantly better than negligible but not necessarily more likely than not" is sufficient to obtain preliminary injunctive relief. Reilly, 858 F.3d at 179. The requisite strength of a claim on the merits depends ultimately on the balance of the harms: "the more net harm an

injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief." Id.

Section 1983 of Title 42 of the United States Code creates a private cause of action to redress constitutional wrongs committed by state officials. 42 U.S.C. § 1983. The statute is not a source of substantive rights, but serves as a mechanism for vindicating rights otherwise protected by federal law. Gonzaga Univ. v. Doe, 536 U.S. 273, 284-85 (2002); Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996). To state a Section 1983 claim, a plaintiff must show a deprivation of a "right secured by the Constitution and the laws of the United States . . . by a person acting under color of state law." Kneipp, 95 F.3d at 1204 (quoting Mark v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir. 1995)). Defendants ostensibly do not dispute that they are state actors. We must thus assess whether Act 41 deprives the Association of rights secured by the United States Constitution.

The Association asserts three Section 1983 claims: *first*, that Act 41 violates its right to substantive due process under the Fourteenth Amendment; *second*, that Act 41 effects an unconstitutional taking of private property in contravention of the Fifth Amendment; and *third*, that Act 41 interferes with the Association's contracts with both its members and its insureds, in violation of the Contract Clause. The Association seeks preliminary injunctive relief based on each of its Section 1983 claims. Because we find, as in JUA I, that the Association has shown a reasonable probability of success on the merits of its takings claim, we restrict our analysis to that cause of action. See Trefelner *ex rel.* Trefelner v. Burrell Sch. Dist., 655 F.

Supp. 2d 581, 590 (W.D. Pa. 2009); First Health Grp. Corp. v. Nat'l Prescription Adm'rs, Inc., 155 F. Supp. 2d 194, 234 (M.D. Pa. 2001).

The Association's Takings Clause claim is grounded in large part in our summary judgment opinion in JUA I. The parties' arguments *sub judice* each center on attempted analogy to or distinction from that decision. Accordingly, before examining the plausible merit of the Association's claims in this case, we briefly revisit the *ratio decidendi* undergirding JUA I.

   1.   ***JUA I***

In JUA I, the Association brought similar constitutional claims challenging the General Assembly's attempt to transfer $200,000,000 of the Association's surplus to the Commonwealth's General Fund. JUA I, 2018 WL 2263549, at *5. Governor Wolf and the General Assembly contended, under various legal theories, that the Association is a creature of statute with no rights against the Commonwealth and whose assets are public property. See id. at *6-14. Defendants remonstrated that the Commonwealth created the Association and posited, as they do here, that the power to control, alter, and destroy the Association flows necessarily from the power to create it. See id.; see also JUA I, No. 1:17-CV-2041, Doc. 66 at 28 (Feb. 9, 2018); id., Doc. 80 at 2 (Apr. 16, 2018).

We disagreed with defendants' contention that the Association is a public entity and its assets public property solely by virtue of the Association's statutory roots, drawing on a body of persuasive federal and state court decisions. JUA I, 2018 WL 2263549, at *9-11 (citing Miss. Surplus Lines Ass'n v. Mississippi, 261 F. App'x 781 (5th Cir. 2008), aff'g 442 F. Supp. 2d 335 (S.D. Miss. 2006); Asociacion de

Subscripcion Conjunta del Seguro de Responsabilidad Obligatorio v. Flores Galarza, 484 F.3d 1 (1st Cir. 2007); Tex. Catastrophe Prop. Ins. Ass'n v. Morales, 975 F.2d 1178 (5th Cir. 1992); Med. Malpractice Ins. Ass'n v. Superintendent of Ins. of the State of N.Y., 533 N.E.2d 1030 (N.Y. 1988) ("MMIA")).  From those decisions, we distilled several factors for assessing the public-versus-private nature of a state-created entity and its assets, including "the nature of the association's function, the degree of control reserved in the state (or the level of autonomy granted to the association), and the statutory treatment, if any, of the entity, in addition to the nature of the funds implicated."  Id. at *11.

Through the prism of these factors, we found both the Association and its funds to be private in nature.  As to the Association itself, we determined that it is "at its core, an insurance company," which performs an "inherently private" function and is funded exclusively by privately-paid premiums.  Id. at *12.  We rejected defendants' suggestion that the MCARE Act subjects the Association to the imperious control of the Commissioner and observed that, per contra, the statute vested all "powers and duties" of the Association "in and [to be] exercised by a board of directors."  Id. (alteration in original) (quoting 40 PA. STAT. & CONS. STAT. ANN. § 1303.731(a)).  We acknowledged that the MCARE Act includes limitations concerning rate-setting and dissolution, and required Commissioner approval of the Association's deficits, but held that those limitations were not meaningfully distinguishable from regulations applicable to other private insurers.  Id. at *12-13. We concluded that "the Joint Underwriting Association is no more closely managed

by the Commonwealth than any other private insurer authorized to write insurance in the state." Id. at *13.

We also found the Association's surplus funds to be private property. Id. (citing Miss. Surplus Lines Ass'n, 261 F. App'x at 785, 786-87). We noted that the Association has never received Commonwealth funding and that the MCARE Act explicitly disclaimed state responsibility for the Association's debts and liabilities. Id. (citing 40 Pa. Stat. & Cons. Stat. Ann. § 1303.731(c)). And we underscored that the Association is sustained exclusively by private premiums, "paid by private parties in exchange for private insurance coverage," as well as any investment income and interest generated on those premiums. Id.

Based on these considerations, we concluded that the Joint Underwriting Association is a private entity and its surplus funds are private property. Id. at *14. In so doing, we observed that the Commonwealth made a choice when it created the Association in 1975, and that its choice has present-day constitutional consequences:

> The legislature had the option to tightly circumscribe the Association's operations and composition of its board, cf. MMIA, 533 N.E.2d at 1036-37 (citing McKinney's Insurance Law § 5501 *et seq.*); to establish the Association as a special fund within the state's treasury, cf. 40 Pa. Stat. & Cons. Stat. Ann. § 1303.712(a); or to retain meaningful control in any number of other ways. That the General Assembly chose to achieve a public health objective through a private association has a perceptible benefit: it assures availability of medical professional liability coverage throughout the Commonwealth at no public cost. By the same token, it also has a consequence: the General Assembly cannot claim *carte blanch* access to the Association's assets.

Id.  The result, we determined, is that the Commonwealth cannot take private property acquired by the Association without just compensation.  Id.

### 2. *Merits in the Instant Case*

Act 41 responds directly to our analysis in <u>JUA I</u>.  The Act endeavors to alter the nature of the Association and wholly remodel its governance structure in a *post hoc* attempt to "clarif[y] the intent that [the Association] is an instrumentality" of the state.  (<u>See</u> Doc. 19 at 1; <u>see</u> <u>also</u> <u>id.</u> at 8).  As set forth *supra*, Act 41 absorbs the Association into the Department as an arm of the Commonwealth, transfers control of the Association from its private board to a board of political appointees, articulates with specificity the board's authority and responsibilities, and allows the Commissioner to select a new executive director to head the Association.  <u>See</u> Act 41, § 3.  The Act directs the newly-reconstituted Association to transfer its existing assets to the Department by July 22, 2018.  <u>See</u> <u>id.</u> §§ 3, 7.

The Association contends that Act 41 is the General Assembly's attempt to do indirectly what <u>JUA I</u> prohibits it from doing directly—taking the Association's private assets without just compensation in violation of the Fifth Amendment.  (<u>See</u> Doc. 5 at 4-8).  At this preliminary stage, we find that the Association has shown a "significantly better than negligible" probability of success on the merits of this claim.  <u>See</u> <u>Reilly</u>, 858 F.3d at 179.

Our decision in <u>JUA I</u> establishes as a matter of law that monies earned by the Association and held in its accounts are private funds entitled to the protection of the Takings Clause.  <u>See</u> <u>JUA I</u>, 2018 WL 2263549, at *14.  The Association argues that this determination is entitled to preclusive effect against defendants in this

case.  We agree that the traditional elements of issue preclusion are satisfied, at least as to Governor Wolf: the private nature of the association's funds was actually litigated and decided in a valid and final judgment in <u>JUA I</u>; the issue was essential to the judgment entered; and Governor Wolf was a defendant in that case.[2]  <u>See</u> <u>Nat'l R.R. Passenger Corp. v. Pa. Pub. Util. Comm'n</u>, 288 F.3d 519, 525 (3d Cir. 2002) (citing <u>Burlington N. R.R. Co. v. Hyundai Merchant Marine Co.</u>, 63 F.3d 1227, 1231-32 (3d Cir. 1995)).

Defendants rejoin that Act 41 reflects an intervening change in the law, rendering <u>JUA I</u> inapplicable.  (<u>See</u> Doc. 18 at 9; Doc. 19 at 10).  Collateral estoppel generally will not apply when "'controlling facts or legal principles have changed significantly since the [prior] judgment.'"  <u>Karns v. Shanahan</u>, 879 F.3d 504, 514 (3d Cir. 2018) (alteration in original) (quoting <u>Montana v. United States</u>, 440 U.S. 147, 155 (1979)).  Governor Wolf posits that the legislature's self-serving change in the law permits the parties and the court to circumvent constitutional determinations reached in <u>JUA I</u> with respect to the private nature of the Association's funds.  (<u>See</u> Doc. 19 at 10).  The General Assembly echoes this premise, reviving its argument from <u>JUA I</u> that a legislature can do what it pleases with entities it creates.  (<u>See</u> Doc. 18 at 9-16).

---

[2] The Joint Underwriting Association argues that the elected leaders of the General Assembly are in privity with the General Assembly itself for purposes of any *res judicata* application *sub judice*.  (<u>See</u> Doc. 5 at 6).  Because the Association need only show a likelihood of success on a single claim in order to obtain injunctive relief, <u>see</u> <u>Trefelner</u>, 655 F. Supp. 2d at 590; <u>First Health Grp. Corp.</u>, 155 F. Supp. 2d at 234, we defer resolution of this question.

At its essence, Governor Wolf's position is that, with a legislative vote and the stroke of the Governor's pen, what were private funds yesterday may become public funds tomorrow—with no consideration due the prior owner. (See id.) The court is sensitive to the deference and "wide leeway" rightly accorded to the legislative prerogative. See Holt Civic Club v. City of Tuscaloosa, 439 U.S. 60, 71 (1978). This deference notwithstanding, the repercussive breadth of the Governor's suggestion is troubling, particularly because it is offered with no jurisprudential support. (See Doc. 19 at 7-10). For purposes of the instant motion, we find that Act 41's attempted *ipse dixit* transfiguration of the Association's private assets into public property raises a plausible constitutional question.

The parties also dispute whether and to what extent the General Assembly may alter the governance structure of the Joint Underwriting Association itself. In defense of Act 41, the General Assembly invokes the axiom that "the State may destroy or reshape any unit it creates." Hess v. Port Auth. Trans-Hudson Corp., 513 U.S. 30, 47 (1994); (Doc. 18 at 11-12). The Association counters that the General Assembly may shift the Association's function into the Department but is powerless to destroy it outright, citing Trustees of Dartmouth College v. Woodward, 17 U.S. (4 Wheat.) 518 (1819), for the proposition that a state legislature cannot unilaterally alter the governance structure of private entities.

We held in JUA I that, by relinquishing control of the Association to its board, the General Assembly released the Association from any residual sovereign mooring. JUA I, 2018 WL 2263549, at *14. Whether the Commonwealth can now recapture the Association through *post hoc* legislation—irrespective of private rights

and interests accrued by the Association over more than four decades—presents complex constitutional questions. We need not resolve these questions today. As it stands under JUA I, the Association's funds are private property that cannot be taken, directly or indirectly, without just compensation. See id. We conclude that the Joint Underwriting Association has shown a likelihood of success on the merits sufficient to warrant preliminary injunctive relief.[3]

**B.    *Irreparable Harm***

Irreparable injury is harm of such an irreversible character that prospective judgment would be "inadequate" to make the moving party whole. See Anderson v. Davila, 125 F.3d 148, 163 (3d Cir. 1997); Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 801 (3d Cir. 1989). Mere risk of injury is not sufficient to meet this standard. Rather, the moving party must establish that the harm is imminent and probable. Anderson, 125 F.3d at 164. Harm that may be contained effectively only through immediate injunctive relief is properly deemed "irreparable." Instant Air Freight, 882 F.2d at 801. The required showings on irreparable harm and likelihood of success are correlative: hence, the weaker a plaintiff's merits showing, the more is required of the showing of irreparable harm, and vice versa. See Reilly, 858 F.3d

---

[3] At oral argument, defendants asserted that any takings claim must fail because Act 41 does not "take" anything from the Association. Act 41 transfers total control of the Association to the Commonwealth and grants possession and authority over the Association's assets thereto. Specifically, the Act provides that "within 30 days following the effective date of this section, all paper and electronic documents and files and other assets of the association in the possession of the association, its executive director and employees *shall be transferred* to the Department." Act 41, § 3 (emphasis added). We reject defendants' suggestion that Act 41 does nothing to deprive the Association of its private property.

at 179 (quoting <u>Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins.</u> <u>Co.</u>, 582 F.3d 721, 725 (7th Cir. 2009) (Easterbrook, J.)).  The availability of money damages for an alleged injury will typically "preclude a finding of irreparable harm." <u>Id.</u> at 177 (citing <u>Frank's GMC Truck Center, Inc. v. Gen. Motors Corp.</u>, 847 F.2d 100, 102 n.3 (3d Cir. 1988)).

We have little difficulty concluding that the Association will suffer imminent and irreparable harm if Act 41 is not enjoined from taking effect.  We found in <u>JUA I</u> that by forcing the Association to turn $200,000,000 of its surplus funds over to the state, Act 44 exposed the Association to imminent, irreparable harm.  <u>See</u> <u>JUA I</u>, 2018 WL 2263549, at *15.  Act 41 redoubles that harm, dismantling the Association as presently constituted, ousting its board and president to be replaced by political appointees, and forcing it to transfer *all* of its assets to the Commonwealth.  <u>See</u> Act 41, § 3.  These injuries alone are adequate to require preliminary injunctive relief. Moreover, it is beyond peradventure that a Commonwealth-controlled board would dismiss this litigation, extinguishing at least one plausible constitutional claim, and abandon defense of the appeals pending in <u>JUA I</u>.  At this juncture, the Association has sufficiently established an imminent injury that likely cannot be undone.

### C.    *Remaining Factors*

As this court has previously observed, the public interest favors preliminary injunctive relief when a plaintiff has demonstrated both a likelihood of success on the merits and irreparable harm.  <u>See</u> <u>Johnson v. Wetzel</u>, 209 F. Supp. 3d 766, 781 (M.D. Pa. 2016) (Conner, C.J.) (collecting cases).  This interest is particularly strong

when the right at issue derives from the Constitution itself.  See id.  The public interest favors preliminary injunctive relief in this case.

To determine whether injunctive relief would result in greater harm to the nonmovant, we must examine the terms of the requested injunction, consider the parties' respective positions, and assess the ramifications of the relief sought.  See Novartis Consumer Health Inc. v. Johnson & Johnson–Merck Consumer Pharms., Inc., 290 F.3d 578, 596-97 (3d Cir. 2002).  Injunctive relief should generally be denied if potential harm to the nonmovant substantially outweighs the potential benefit to be bestowed upon the movant.  See id.

We agree with both the Commonwealth defendants and the legislative leaders that the General Assembly and the public have strong interests in free exercise of the legislative prerogative and an unencumbered lawmaking process. Beyond this generalized interest, however, defendants have failed to point to any countervailing injury to the Commonwealth or to the public if Act 41 is temporarily enjoined.  Nor has the General Assembly identified any exigency justifying its desire to absorb the Association into the Commonwealth immediately.  As in JUA I, the court stands ready to expedite full merits disposition of this matter, such that Act 41 will be preliminarily enjoined for only a short period of time.  Accordingly, we conclude that the balance of the respective hardships favors injunctive relief.

## V.   Conclusion

For all of the reasons stated herein, we find that preliminary injunctive relief is necessary to preserve the status quo pending merits review of the Joint Underwriting Association's constitutional claims.  An appropriate order shall issue.


/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania


Dated:      July 18, 2018