# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **PENNSYLVANIA** | : |
| **PROFESSIONAL LIABILITY** | : CIVIL ACTION NO. 1:18-CV-1308 |
| **JOINT UNDERWRITING** | : ("JUA v. Wolf II") |
| **ASSOCIATION,** | : |
| | :(The Honorable Christopher C. |
| **Plaintiff,** | :Conner) |
| | : |
| **v.** | : |
| | : |
| **TOM WOLF, IN HIS OFFICIAL CAPACITY** | : |
| **AS GOVERNOR OF THE** | : |
| **COMMONWEALTH OF** | : |
| **PENNSYLVANIA; THE GENERAL** | : |
| **ASSEMBLY OF THE COMMONWEALTH** | : |
| **OF PENNSYLVANIA; JOSEPH B.** | : |
| **SCARNATI, IN HIS OFFICIAL CAPACITY** | : |
| **AS PRESIDENT PRO TEMPORE OF THE** | : |
| **SENATE; JAY COSTA, IN HIS OFFICIAL** | : |
| **CAPACITY AS MINORITY LEADER OF** | : |
| **THE SENATE; MICHAEL TURZAI, IN** | : |
| **HIS OFFICIAL CAPACITY AS SPEAKER** | : |
| **OF THE HOUSE OF REPRESENTATIVES;** | : |
| **FRANK DERMODY, IN HIS OFFICIAL** | : |
| **CAPACITY AS MINORITY LEADER OF** | : |
| **THE HOUSE OF REPRESENTATIVES;** | : |
| **AND JESSICA K. ALTMAN, IN HER** | : |
| **OFFICIAL CAPACITY AS INSURANCE** | : |
| **COMMISSIONER OF PENNSYLVANIA,** | : |
| | |
| **Defendants.** | |

_____

# THE AMERICAN MEDICAL ASSOCIATION AND PENNSYLVANIA MEDICAL SOCIETY *AMICUS* BRIEF IN SUPPORT OF PLAINTIFF'S AMENDED COMPLAINT AND MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

## Contents

I.  INTRODUCTION ................................................................................................... 1

II.  CONCISE STATEMENT OF THE AMA AND MEDICAL SOCIETY, THEIR INTEREST IN THIS CASE AND THE SOURCE OF THEIR AUTHORITY TO FILE .. 2

III.  BACKGROUND .................................................................................................. 4

  A.  Act 41 of 2018 ................................................................................................... 4

  B.  Contract Between the Association and Insurance Policyholder .................. 5

IV.  ARGUMENTS ..................................................................................................... 7

  A.  Act 41 is Unconstitutional Because it is a Taking of JUA Policyholders' Vested Rights in JUA Funds without Just Compensation. ....................................... 7

  B.  Act 41 is Unconstitutional Because it is a Substantial Impairment of Express and/or Implied Contract Terms and does not Serve a Legitimate Purpose that is Necessary and Reasonable Under the Circumstances. ............. 9

  C.  The Physician Community has Reasonable Grounds for Insecurity with Respect to the State's Ability to Maintain the Integrity of JUA Funds and to Honor Existing Policyholder Contracts. ..................................................................... 20

IV.  CONCLUSION ................................................................................................... 24

# TABLE OF AUTHORITIES

## Cases

Alliance of American Insurers v. Chu, 571 N.E.2d 672, 679 (N.Y. 1991)............... 8

Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 244 (1978)............ 6, 10, 16

Energy Reserves Group, Inc. v. Kansas Power & Light Co., 459 U.S. 400, 411-12
  (1983). ...............................................................................................10, 15, 17

Garris v. Hanover Ins. Co., 630 F.2d 1001, 1008 (4th Cir. 1980) ........................... 18

General Motors Corp. v. Romein, 503 U.S. 181, 186 (1992)..................................... 11

Home Bldg. & Loan Assoc'n v. Blaisdell, 290 U.S. 398, 429 (1934) .................9, 10

Hosp'l & Health System Ass'n of Pa. v. Commonwealth, 77 A.3d 587, 591 (Pa.
  2013) ....................................................................................................... 20, 22

Jenkins v. County of Schuylkill, 658 A.2d 380, 383 (Pa. Super. 1995)................... 5

Manigault v. Springs, 199 U.S. 473, 480 (1905)............................................................. 16

Mercado – Boneta v. Admnistracion del Fondo de Compensacion al Paciente
  through Ins. Comm'r, 125 F.3d 9, 16 (1st Cir. 1997)................................................ 19

Mississippi ex rel. Robertson v. Miller, 276 U.S. 174, 179 (1928) ......................... 11

Nieves v. Hess Oil Virgin Islands Corp., 819 F.2d 1237, 1244 (3d Cir. 1987) .... 9,
  11

Pennsylvania Medical Society v. Dep't of Public Welfare of the Commonwealth
  of Pa., 614 Pa. 574, 581, 39 A.3d 267, 271-72 (2012) ...................................... 21, 22

Schreiber v. Olan Mills, 627 A.2d 806, 808 (Pa.Super. 1993) ................................... 6

Sturges v. Crowninshield, 4 Wheat. 122, 197 (1819)...................................................... 9

Transport Workers Union, Local 290 by and through Fabio v. SEPTA, 145 F.3d
  619, 622 (3d Cir. 1998) ................................................................................................ 6

Tuttle v. N.H. Med'l Malpractice Joint Underwriting Assoc'n, 648-649 (N.H.
  2010) .........................................................................................................8, 13, 18, 19

United States Trust Co. of New York v. New Jersey, 431 U.S. at 19-20 n.17) ..... 9,
  17, 19

Von Hoffman v. City of Quincy, 4 Wall. 535, 550, 552 (1866) ............................... 10

Wis. Med'l Soc'y v. Morgan, 787 N.W.2d 22, 42 (Wis. 2010).....................................7

## Other Authorities

40 P.S. §1303.1102(a)........................................................................................................... 21

40 P.S. §1303.1112(a) ............................................................................... 21, 22

40 P.S. §1303.711(a) ...................................................................................6, 20

40 P.S. §1303.731(a),(b) ................................................................................ 12

72 P.S. §1717.1-K(1) ...................................................................................... 22

Act 41, Section 901-A(1) ..............................................................................5, 16

Act 41, Section 901-A(2) ................................................................................... 5

Act 41, Section 901-A(3) ..............................................................................5, 20

Act 41, Section 911-A(C)(1) ............................................................................. 5

Act 41, Section 911-A(C)(2) ....................................................................... 14, 15

Act 41, Section 912-A(A) ................................................................................ 12

Act 41, Section 912-A(B) ................................................................................ 12

Act 41, Section 912-A(F) ................................................................................ 12

Act 41, Section 912-A(G) .......................................................................... 12, 15

Act 41, Section 913-A(B) ................................................................................. 5

Act 41, Section 921-A(1) ................................................................................ 15

Act of October 9, 2009, P.L. 537, No. 50, §7(5) and 72 P.S. §1717-K ................. 22

Article I, §10 of the United States Constitution ................................................. 9

Article XI-A of Act 41 ..................................................................... 4, 11, 13, 24

U.S. Const., Amdt. V ....................................................................................... 7

## THE AMERICAN MEDICAL ASSOCIATION AND PENNSYLVANIA MEDICAL SOCIETY *AMICUS* BRIEF IN SUPPORT OF PLAINTIFF'S AMENDED COMPLAINT AND MOTION FOR SUMMARY JUDGMENT

AND NOW, comes the American Medical Association ("AMA") and the Pennsylvania Medical Society ("Medical Society"), collectively *amici,* by and through their counsel, Gordon & Rees, and hereby file this *Amicus* Brief in support of Plaintiff Pennsylvania Professional Liability Joint Underwriting Association's, ("JUA" or "Association"), Amended Complaint and Motion for Summary Judgment, and sets forth as follows:

### I.  INTRODUCTION

In its Amended Complaint, the Association asserts that Act 41 of 2018, amending the Pennsylvania Insurance Department Act of 1921, Act of May 17, 1921, P.L. 798, No. 285, to be effective July 22, 2018, (the "Act" or "Act 41"), is an unconstitutional taking violative of the Fifth Amendment to the United States Constitution; deprives Plaintiff of Due Process; unconstitutionally impairs the Association's contracts with its members; and unconstitutionally impairs the Association's contracts with its insureds.   Plaintiff's Amended Complaint at Counts I-III.

The AMA and the Medical Society, individually and on behalf of their members that include Association policyholders and Pennsylvania physicians,

have a significant interest in the outcome of this litigation, and, with approval of the Court, file this *Amicus* Brief in support of Plaintiff's Amended Complaint and Motion for Summary Judgment.

## II. CONCISE STATEMENT OF THE AMA AND MEDICAL SOCIETY, THEIR INTEREST IN THIS CASE AND THE SOURCE OF THEIR AUTHORITY TO FILE

The AMA is the largest association of physicians, residents and medical students in the United States.   Additionally, through state and specialty medical societies and other physician groups seated in its House of Delegates, substantially all United States physicians, residents and medical students are represented in the AMA's policy-making process.   The objectives of the AMA are to promote the science and art of medicine and the betterment of public health.   AMA members practice in every medical specialty area and in every state, including Pennsylvania.

Founded in 1848, the Medical Society is presently the largest physician organization in Pennsylvania, comprised of over 16,000 physicians and medical students, and governed by physician members, including a Board of Trustees.   Among its services, and a top priority, is advocacy for physicians at the state government level on matters involving medical professional liability

("MPL") insurance and advocacy for physicians and Commonwealth residents, patients, in advancing public policy and public health measures.

Hence, the *amici* have an interest in this case because the statute at issue, Act 41 of 2018, would result in an overhaul of the Association and a transfer of its operations, administration, and governance to the Commonwealth thereby resulting in an unconstitutional taking of Association funds and vested property rights of insured-policyholders, and impairing the contractual relationship between the Association and its current policyholders, for the reasons set forth by Plaintiff and herein.  After two prior unsuccessful attempts by the Commonwealth, Act 41 is just the first step of the Defendants' plan to obtain the JUA's excess funds, to be used by the Defendants to meet statutory budget requirements or other uses not consistent with their intended purpose when collected.

In the two recent and unsuccessful attempts by the Commonwealth to obtain JUA funds, the Medical Society was permitted by this Court to submit *Amicus* briefs.   The Middle District of Pennsylvania has inherent authority to permit the filing and consideration of this *Amicus* Brief.  See Motion of *Amici* for Leave to File *Amicus* Brief.

This Brief is filed on behalf of *amici*, on their own behalves and as representatives of the Litigation Center of the AMA and the State Medical

3

Societies.  The Litigation Center is a coalition among the AMA and the medical societies of every state.  Its purpose is to represent the viewpoint of organized medicine in the courts.

### III.   BACKGROUND

A.   <u>Act 41 of 2018</u>

Act 41 is the Legislature's third attempt at an unconstitutional taking of Association funds.   This time the Legislature requires the transfer of all assets of the Association, not just the alleged $200,000,000 of excess surplus.  Act 41, Section 921-A(1).  The Act further gives the Commonwealth operational and administrative control of the Association by removing the Association's current board and replacing the board with political appointees.   Act 41, Section 912-A(A).  The Act gives the new board all authority to administer the plan of operations (to be amended consistent with the Act), to decide all matters of policy, and to have all authority necessary to operate the Association. Act 41, Section 912-A(G).  The day-to-day operations of the new board would be managed by an appointed Executive Director, a newly-created position to be hired by the Insurance Commissioner.  Act 41, Section 912-A(F).

The Legislature unilaterally declared the following policy reasons for the enactment of Article XI-A of Act 41:

- A decrease of claim payments and a decline in the need for JUA policies was identified when the Insurance Commissioner reviewed the Association's Plan of Operation and rate filings.  Act 41, Section 901-A(1).

- A  need to modernize the Association for economical and administrative efficiencies. Id.

- Ensuring the future availability of and access to a full spectrum of hospital services and highly trained physicians.  Act 41, Section 901-A(2).

- In order to provide such availability and access, MPL insurance policies must be affordable and reasonably cost.  Act 41, Section 901-A(3).

- Placing the Association within the Department of Insurance (hereafter, "Department") will result in more oversight by the Insurance Commissioner of expenditures and will ensure better operational efficiencies of the Association. Id.

In the event of dissolution, the Act permits distribution of all Association assets as the new board may determine, with approval of the Insurance Commissioner.  Act 41, Section 913-A(B).  Finally, Act 41 takes away any right of an insured's claim to the funds of the Association.  Act 41, Section 911-A(C)(1).

## B.   Contract Between the Association and Insurance Policyholder

Under Pennsylvania law, a contract is validly formed if there was an offer, an acceptance of the offer, consideration or mutual meeting of the minds. Jenkins v. County of Schuylkill, 658 A.2d 380, 383 (Pa. Super. 1995)

(citing <u>Schreiber v. Olan Mills</u>, 627 A.2d 806, 808 (Pa.Super. 1993)). "Contracts enable individuals to order their . . . affairs according to their particular needs and interests.  Once arranged, those rights and obligations are binding under the law, and the parties are entitled to rely on them." <u>Allied Structural Steel Co. v. Spannaus</u>, 438 U.S. 234, 245 (1978).  The purpose of the Contract Clause is to protect these legitimate expectations from unreasonable legislative interference. <u>Transport Workers Union, Local 290 by and through Fabio v. SEPTA</u>, 145 F.3d 619, 622 (3d Cir. 1998).

The MCARE Act requires every healthcare professional providing healthcare services in the Commonwealth to purchase MPL insurance from an insurer.  40 P.S. §1303.711(a).  The MCARE Act further directs that the JUA will offer MPL insurance required thereunder to healthcare professionals who cannot conveniently obtain MPL insurance through ordinary methods and at rates not in excess of those similarly-situated.  <u>Id.</u> at §1303.732(a).

In exchange for the Association's obligation to defend an insured and pay compensatory damages on their behalf, the insured pays an annual premium to the Association.  The terms and conditions of their contractual arrangement are set forth in the insured's insurance policy which addresses, among other things,  insurance coverage amounts, obligations of the insured

and of the Association, exclusions to coverage, and notification requirements. See Plaintiff's Motion for Summary Judgment, at n. 23, referencing Medical Professional Liability policy, attached as Ex. 1 to the Declaration of Susan Sersha.

### IV.   ARGUMENTS

**A.   <u>Act 41 is Unconstitutional Because it is a Taking of JUA Policyholders' Vested Rights in JUA Funds without Just Compensation.</u>**

Pursuant to the Fifth Amendment to the United States Constitution, no "private property [shall] be taken for public use, without just compensation." U.S. Const., Amdt. V.  It was the expectation of the insured-policyholders at the time of contract creation that the premiums that they paid would be used by the Association for the purpose of paying claim expenses and indemnity. Where the purpose of funds being held are for satisfying judgments against healthcare providers, courts have concluded that the insured-providers retained a vested entitlement to have the funds used in the manner intended. See, e.g., <u>Wis. Med'l Soc'y v. Morgan</u>, 787 N.W.2d 22, 42 (Wis. 2010) (stating that [a]ny improper removal of money from the Fund infringes upon this right [to the security and integrity of the Fund], and is likely to affect individual providers"); <u>Tuttle v. N.H. Med'l Malpractice Joint Underwriting</u>

Assoc'n, 992 A.2d 624, 648-649 (N.H. 2010) ("Because policyholders paid for and received participating policies, incorporating the regulations in effect at the time, their beneficial interest in the treatment of any JUA excess surplus vested upon the issuance of their policies").   Similarly here the insured-policyholders have a right to the security and integrity of the JUA funds to be used for their intended purpose.

The transfer of JUA funds to the Commonwealth diverts those funds from their intended purpose of providing insurance coverage to the insured-policyholders.   Under the Act, the funds, comprised of policyholder premiums and interest therefrom, can be used for whatever purpose as is determined by the government-appointed board. Act 41, Section 912-A(g)(6).   This is a departure from the intent at the time that these contracts were entered into; that is, the money paid was to be used to pay for claims and related expenses. However, if Act 41 is permitted to stand, the board can decide to use the funds in any way, without limiting it to the original intent under the contract between the JUA and the insureds.   See Alliance of American Insurers v. Chu, 571 N.E.2d 672, 679 (N.Y. 1991).   These vested rights of the insured-policyholders cannot be extinguished by legislative action.   Therefore, Act 41, as it permits the use of the Association funds for purposes other than insurance coverage, should be declared unconstitutional.

**B. <u>Act 41 is Unconstitutional Because it is a Substantial Impairment of Express and Implied Contract Terms and does not Serve a Legitimate Purpose that is Necessary and Reasonable Under the Circumstances.</u>**

The Defendants' unilateral act of promulgating Act 41 unconstitutionally takes over the governance and administration of the Association's insurance policies with its insureds and all assets, and by its very existence creates an impairment of the contract between the Association and the policyholders.  Further, Act 41 impairs express and implied contract terms of the insurance policy.

Article I, §10 of the United States Constitution states, in relevant part, that "[n]o state shall…pass any law…impairing the Obligation of Contracts." The obligation of contracts is "'the law which binds the parties to perform their agreement.'" <u>Home Bldg. & Loan Assoc'n v. Blaisdell</u>, 290 U.S. 398, 429 (1934) (quoting <u>Sturges v. Crowninshield</u>, 4 Wheat. 122, 197 (1819)).  The obligations of a contract also include the contemporaneous state law addressing interpretation and enforcement of the contract.  <u>Nieves v. Hess Oil Virgin Islands Corp.</u>, 819 F.2d 1237, 1244 (3d Cir. 1987)(quoting <u>United States Trust Co. of New York v. New Jersey</u>, 431 U.S. at 19-20 n.17).  "This principle presumes that contracting parties adopt the terms of their bargain in reliance on the law in effect at the time the agreement is reached."  <u>Id.</u>  The laws that

exist at the time and place the contract is made and where it is to be performed become a part of the contract, as if they were expressly referred to or incorporated into the terms of the contract.  Blaisdell, 290 U.S. at 429-30 (quoting Von Hoffman v. City of Quincy, 4 Wall. 535, 550, 552 (1866)).

The United States Supreme Court has set forth a three-part analysis:

(1) Does the legislation substantially impair a contractual relationship?

(2) If so, did the Defendants have a significant and legitimate public purpose for enacting the legislation?

(3) If so, is the legislation reasonable under the circumstances?

See Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 244 (1978); see also Energy Reserves Group, Inc. v. Kansas Power & Light Co., 459 U.S. 400, 411-12 (1983).

> *1. Article XI-A of Act 41 Substantially Impairs the Contractual Relationship between the Association and its Insureds.*

The threshold inquiry is whether the change has "operated as a substantial impairment of a contractual relationship."  Allied Structural Steel Co., 438 U.S. at 244; see also Energy Reserves Group, Inc., 459 U.S. at 411-412).  The questions to be answered are:

(1) Is there a contractual relationship?

(2) Does the change in law impair the contractual relationship?

10

(3) If so, is the impairment of the contractual relationship substantial?

General Motors Corp. v. Romein, 503 U.S. 181, 186 (1992).   Legislation impairs obligations of a contract when it renders them invalid, releases them, or extinguishes them.  Blaisdell, 290 U.S. at 431 (citing Sturges, 4 Wheat. at 197-198).  The severity of the impairment will increase the level of scrutiny of the legislation.  Energy Resources Group, Inc., 459 U.S. at 411(citing Allied Structural Steel, 438 U.S. at 245).

Even if a statute does not impair the express terms of a contract, it remains unconstitutional to substantially impair implied contract terms and implied contracts. Nieves v. Hess Oil Virgin Islands Corp., 819 F.2d 1237, 1244 (3d Cir. 1987) (quoting Mississippi ex rel. Robertson v. Miller, 276 U.S. 174, 179 (1928)).

Here, the insurance policy between the Association and an insured is a contract.   Article XI-A of Act 41 impairs the contractual relationship between the Association and its policyholders.  First and foremost, pursuant to Article XI-A, the Association will be subsumed by the Commonwealth.   The Commonwealth will completely take over the role, obligations, and rights of the Association, a private entity, including a take over of JUA insurance policyholders without the consent of the policyholders.

The MCARE Act of 2002 provided that the Association's members, private insurers, have the right to govern the Association under a plan of operations that vests power in a board of directors, subject only to the Insurance Commissioner's approval of the plan. 40 P.S. §1303.731(a),(b).  The Department of Insurance would only supervise the Association.  Id.  The plan as approved vests the powers and duties of the Association in a member-controlled board of directors.  Id.

Act 41 changes this structure, the obligations, supervision, and powers of the Association and its board of directors by, among other things:

- Dismissing current board membership and replacing it with appointments by the Governor, the president pro tempore of the senate, minority leader of the senate, speaker of the House of Representatives, and the minority leader of the House of Representatives.  Act 41, Section 912-A(A).  It further provides that the Governor will appoint the chairman of the board.  Act 41, Section 912-A(B).

- Creating a new position, an Executive Director, to provide the day-to-day operations of the board; the Executive Director is hired by Pennsylvania's Insurance Commissioner.  Act 41, Section 912-A(F).

- Providing the new board with all authority to administer the plan of operations (to be amended consistent with the Act), to decide all matters of policy, and to have all authority necessary to operate the Association.  Act 41, Section 912-A(G).   In furtherance of the same, the new board can adopt bylaws and guidelines, appoint committees, enter into contracts for administration of the new plan, develop rates, policy forms, and riders, invest, borrow and disburse funds, and place a portion of Association funds in a restricted receipt

account in the Treasury Department.  Act 41, Section 912-A(G)(1)-(6).

At the time they entered into the contractual relationship, an insured would not justifiably expect that the Legislature would eliminate the JUA and take over its functions as will result if Article XI-A is not enjoined.  No provision of the regulatory scheme at the time prior to passage of Act 41 would have suggested to the private insureds that they should anticipate that their policies and all governance of them would be transferred to the Commonwealth.  See similarly <u>Tuttle v. N.H. Med'l Malpractice Joint Underwriting Assoc'n</u>, 992 A.2d 624, 642 (N.H. 2010). The creation of the insurance policy agreement was a meeting of the minds between an insured and the Association as it was formed and governed pursuant to the MCARE Act.  Act 41 at Article XI-A contravenes the Association and its contractual responsibilities to its policyholders.  See <u>Id.</u> at 644.

It is the position of *amici* that the complete takeover of the Association by the Commonwealth is enough to conclude that a substantial impairment of contract exists.  However, should the Court require specific examples of contractual impairment, *amici* present the following specific terms and conditions of the insurance policy of insureds as examples of impairment should Article XI-A be permitted as law.

From an analysis of the insurance policy:

| 1. | ACTION AGAINST ASSOCIATION:  "Nothing contained in this policy shall give any person or organization other than the Insured any right against the Association as any third party beneficiary or otherwise." |
|----|---|

This provision of the insurance policy substantiates an insured's right to sue the Association.  In comparison, pursuant to Act 41 at Section 911-A(C)(2), should Act 41 stand, an insured loses any claim it might have against the Association, and instead, such claim becomes a liability of the Commonwealth.  One might be inclined to conclude that the insured's right of suit remains.  However, there is a difference to an insured as to whether they would be willing to pursue a valid legal claim against a private entity like the JUA or one against the Commonwealth.

| 2. | CHANGES: "The terms of this policy shall not be waived or changed, except by written endorsement issued to form a part of this policy." |
|----|---|

This second provision does not permit the insurance policy to be changed in any way without an appropriate endorsement.  Accordingly, by transferring the insureds' policies to the Commonwealth without such endorsement, it impairs the contract by substituting a new obligor.  This alone should be enough to find an impairment of contract.

Further, the insureds have implied contract rights that vested at the time they purchased their insurance policies.  Act 41 impairs the Association's

contracts with its insured-policyholders including at sections 911-A(C), 912-A(G)(6), and 921-A(1) by:

- Substituting the Commonwealth as the obligor on all existing contracts of insurance issued by the JUA;

- Empowering the new board to put JUA funds into a restricted receipt account to be used for any purpose directed by the board; and

- Requiring that all JUA files, including confidential information of the insured-policyholders be transferred to the Insurance Department.

See in accord Plaintiff's Amended Complaint at ¶22(a)-(c).

> *2. Act 41 does not have a Significant and Legitimate Public Purpose.*

If the Court were to conclude that Act 41 substantially impairs the contract between the Association and its policyholders, the Court next analyzes whether the state had a significant and legitimate public purpose behind the change set forth in the legislation such as a broad and general social or economic problem.  <u>Energy Reserves Group, Inc. v. Kansas Power & Light Co.</u>, 459 U.S. 400, 411-12 (1983).  This part of the analysis is designed to assure that the Legislature is using its police power rather than passing legislation to benefit a special interest.  <u>Id.</u> at 412.   However, "[i]f the Contract

Clause is to retain any meaning at all…, it must be understood to impose some limits upon the power of a State to abridge existing contractual relationships, even in the exercise of its otherwise legitimate police power." <u>Allied Structural Steel Co. v. Spannaus</u>, 438 U.S. 234, 242 (1978) (quoting <u>Manigault v. Springs</u>, 199 U.S. 473, 480 (1905)).

Here, while Defendants may purport that Act 41 addresses a broad, generalized economic or social problem, it does not do so.  The policy reasons in the Act fall into two categories: (1) affordability and accessibility of MPL insurance policies and (2) the alleged need for better operational efficiencies of the Association.  Act 41, Section 901-A(1), (2), (3).

The affordability and accessibility of MPL insurance policies to those unable to obtain the same in the standard insurance market was a primary reason for the creation of the Association in the first place.  There is no indication or basis to conclude that the Association is not meeting this goal, nor is there any such policy statement.

There is likewise no indication or adequate basis to conclude that the Association is not operating efficiently.  In fact, the opposite is readily apparent in the Association's financial statements and department reviews.

16

The legislation at issue was enacted not for the protection of a basic interest of society but rather for purpose of gaining access to Association's funds.

### 3. Act 41 is not Reasonable nor is it of the Character Appropriate to the Public Purpose Justifying the Legislation.

If the legislation is determined to be legitimate, the next inquiry is whether the legislation in adjusting the rights and responsibilities of the contracting parties, is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation. Energy Reserves Group, Inc., 459 U.S. at 412 (quoting United States Trust Co. v. New Jersey, 431 U.S. 1, 22 (1977)). Deference is to be given to state laws directed to addressing broad social and economic problems, unless the state is a contracting party which then requires a stricter scrutiny. Id. at 412-413 (quoting United States Trust Co., 431 U.S. at 22-23). The Defendants bear the burden of proving that contract impairment is reasonable and necessary. Tuttle v. New Hampshire Med'l Malpractice Joint Underwriting Assoc'n, 992 A.2d 624, 643 (N.H. 2010) (citing In re Seltzer, 104 F.3d 234, 236 (9th Cir. 1996)).

Act 41 is not reasonable. In evaluating the reasonableness and necessity of the legislation, courts have examined: "'(1) [the legislation's]

emergency nature; (2) its purpose to protect a broad societal interest, not a favored group; (3) the tailoring of its remedial effect to its emergency cause; (4) the reasonableness of its basic features; and (5) its limited effect in temporal terms.'" Tuttle, 992 A.2d at 648 (citing and quoting Garris v. Hanover Ins. Co., 630 F.2d 1001, 1008 (4th Cir. 1980)).

As noted previously, deference is to be given to the legislation unless the state is a party to the contract; under the latter circumstance, the legislation will be subject to stricter scrutiny.  The state is contending, and stated in the legislation, that the Association is an instrumentality of the state.   Under that circumstance, Article XI-A of Act 41 should be subject to the stricter scrutiny/less deference standard, see Tuttle, 992 A.2d at 645, although it is the position of *amici* that even under the more deference standard, Defendants cannot satisfy this part of the analysis.

Deference does not mean complete deference.  "For the Contract Clause to retain any vitality, we must be able to consider the reasonableness and necessity of the legislature's chosen action, particularly where the action's substantial impairment of contract rights inures to the State's financial benefit", as it does here. See Tuttle, 992 A.2d at 646.  Of relevance is whether the state is acting in its own best interest for its own pecuniary or self-interested capacity.   Mercado – Boneta v. Admnistracion del Fondo de

Compensacion al Paciente through Ins. Comm'r, 125 F.3d 9, 16 (1st Cir. 1997).

Finding that the state's self-interest was at stake, the Tuttle court concluded

that complete deference was not appropriate.    Tuttle, 992 A.2d at 646

(quoting Opinion of the Justices (Furlough), 609 A.2d 1204, 1210 (N.H.

1992)).   It noted:  "'If a State could reduce its financial obligations whenever it

wanted to spend money for what it regarded as an important public purpose,

the Contract Clause would provide no protection at all.'"  Id. at 645- 46 (citing

Furlough, 609 A.2d at 1210); see also United States Trust Co. v. New Jersey,

431 U.S. at 26.

        Similarly here, the state is acting in its own self-serving interest. One

need only look to the recent past in its passage of Acts 85 and 44.  This case

should not be evaluated in a vacuum.  This is not broad-based legislation of a

social or economic nature.   In reality, the Act targets the transfer of the

Association's surplus and assets which were generated by premiums paid by a

discrete class of private persons. See Tuttle, 992 A.2d at 647 (concluding that

a legislative transfer of funds from the Joint Underwriting Association

targeted discrete funds generated by premiums paid by a discrete class of

private parties).  It is the Legislature's third attempt at accessing the money

without regard to the impact on JUA policyholders.  Thus, the means chosen

by the Legislature to accomplish the purpose of the Act is not reasonable and necessary.

### C.   The Physician Community has Reasonable Grounds for Insecurity with Respect to the State's Ability to Maintain the Integrity of JUA Funds and to Honor Existing Policyholder Contracts.

As the Court is already aware, the General Assembly enacted the MCARE Act in 2002 and, simultaneously, created the MCARE Fund—a special fund administered by the Department. See Hosp'l & Health System Ass'n of Pa. v. Commonwealth, 77 A.3d 587, 591 (Pa. 2013) (citing 40 P.S. §§1303.712(a), 1303.713(a)).  The Fund provides excess MPL insurance coverage—a second layer of insurance—to health care providers paying claims that exceed their statutorily-required $500,000 primary or basic coverage amount.  Id. Annual assessments paid by physicians and other healthcare personnel financially support the Fund and are in addition to the premiums they must pay for their primary coverage.   The assessments were designed to reimburse the fund for payment of claims and expenses, pay principal and interest on any monies borrowed by the Fund, and to create a reserve.  Id. at 592 (citing 40 P.S. §1303.712(d)).

The state's medical liability crisis intensified early in the 2000s, increasing the cost of MPL insurance premiums and accordingly the MCARE assessment for physicians.  The pressure resulted in physicians limiting their

scope of practice, leaving the state, or refusing to practice in Pennsylvania.   To
relieve some of the costs of mandated coverage and retain qualified health
care providers in the state, the Legislature implemented several strategies:
First, the 2002 legislation directed motor vehicle surcharge revenues to be
deposited into the MCARE Fund to create an assessment discount program.
Pennsylvania Medical Society v. Dep't of Public Welfare of the Commonwealth
of Pa., 614 Pa. 574, 581, 39 A.3d 267, 271-72 (2012).   Second, in 2003, the
Legislature established the Health Care Provider Retention Program
("Abatement Program" or "Program").  Id. at 582, 39 A.3d at 272.
The intent of the Abatement Program was to provide assessment abatements,
i.e., rebates, to healthcare providers from 2003-2007.  Id. (citing 40 P.S.
§1303.1102(a)).  The Legislature established the Health Care Provider
Retention Account ("HCPR Account"), a special account within the General
Fund, to hold the Program funds.  Id. (citing 40 P.S. §1303.1112(a)).  The
account was funded by two sources: First, the Legislature increased the
cigarette tax and dedicated 25 cents per pack. Second, motor vehicle violation
surcharge revenue was used to partially fund the program.  Id. at 582-83, 39
A.3d at 272-73 (citing 40 P.S. §1303.1112(a)).  In 2004, the Legislature
charged the Budget Secretary with making the monetary transfers from the

HCPR Account to the MCARE Fund.  Id. at 583-84, 39 A.3d at 273 (citing 40 P.S. §1303.1112(c)).

In 2004 and 2005, despite having significant funds in the HCPR Account, the Budget Secretary only transferred a combined $330 million (of a total $946 million) to the MCARE Fund.  Id. The Budget Secretary made no more transfers to the MCARE Fund after 2005, although abatements continued to be granted through 2007, and revenues continued to accumulate in the HCPR Account.  Id.

Faced with an unbalanced budget in 2009, the Governor approved a bill and legislation amending the Fiscal Code, including a repeal of the Abatement Law, abolishment of the HCPR Account, a transfer of all cigarette tax revenue in the HCPR Account to the General Fund, a transfer of $708 million from the HCPR Account to the General Fund, and requiring that $100 million be transferred from the MCARE Fund to the state's General Fund.  Id. at 584-85, 39 A.3d at 274 (citing Act of October 9, 2009, P.L. 537, No. 50, §7(5) and 72 P.S. §1717-K); Hosp'l & Health System Ass'n of Pa. v. Commonwealth, 77 A.3d 587, 593 (Pa. 2013) (citing 72 P.S. §1717.1-K(1)).  The legislation was challenged, with varying results, but the point here being that the Commonwealth has a history of attempting to legislate and mandate the transfer of funds into the General Fund.

Now, once again, the farmer has tapped the proverbial fox to guard the henhouse.  Through Act 41, the General Assembly has placed the JUA under the control, direction and oversight of the Pennsylvania Department of Insurance. The law vests a Board, appointed by the Governor and the leaders of the General Assembly, with governance of the JUA. It also provides additional powers and duties of the Board, which includes, subject to the Commissioner's approval, the ability to place a portion of the JUA's funds in a restricted receipt account in the Treasury. Funds placed in treasury account would be appropriated for the purposes required in the MCARE Act, the Article, and as may otherwise be directed by the Board.  The Act also provides for a method of dissolving the Association, and would then permit the new board to distribute the assets and funds as it would desire.

The Defendants have already showed their hand, having twice before in the last two years to legislate the transfer of JUA funds to the Commonwealth. The Defendants intend to divert the JUA's alleged "excess" funds to the state's funds.  Given the history, the *amici* and physician policyholders are justified in their belief that the state cannot be trusted with the JUA funds or to carry out the duty owed to the JUA physician policyholders; for indeed, the past is prologue.

23

## IV.    CONCLUSION

Accordingly, Act 41, Article XI-V is unconstitutional because it would accomplish an unconstitutional taking of funds from the Association and impairs the obligations of contracts in contravention of Article I, § 10 of the United States Constitution.  The American Medical Association and the Pennsylvania Medical Society respectfully requests that this Honorable Court issue an Order declaring Act 41, Article XI-V unconstitutional and enjoin the Commonwealth accordingly.

Respectfully Submitted,

Date:                                       **GORDON & REES**

BY:_____
Maggie M. Finkelstein, Esquire
Attorney I.D. No. 86305
mfinkelstein@grsm.com
111 N. Front Street
Suite 100
Harrisburg, PA 17101
Tele: 717-775-3308