## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PENNSYLVANIA PROFESSIONAL** | : | **CIVIL ACTION NO. 1:18-CV-1308** |
| **LIABILITY JOINT UNDERWRITING** | : | |
| **ASSOCIATION,** | : | **(Chief Judge Conner)** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **TOM WOLF, in his Official Capacity** | : | |
| **as Governor of the Commonwealth of** | : | |
| **Pennsylvania,** *et al.*, | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM

In May of this year, we entered judgment in <u>Pennsylvania Professional Liability Joint Underwriting Ass'n v. Wolf</u> ("<u>JUA I</u>"), No. 1:17-CV-2041 (M.D. Pa.), declaring portions of Act 44 of 2017, P.L. 725, No. 44 ("Act 44"), to be violative of the Takings Clause of the Fifth Amendment to the United States Constitution and permanently enjoining enforcement of the Act's operative provisions. Finding the Pennsylvania Professional Liability Joint Underwriting Association (the "Joint Underwriting Association" or "Association") to be a private entity and its assets to be private property, we concluded that the state cannot expropriate to its own use funds held in the Association's coffers.

The General Assembly responded by enacting Act 41 of 2018, P.L. 273, No. 41 ("Act 41"), on June 22, 2018. Act 41 deploys <u>JUA I</u> as a blueprint, endeavoring to avoid the constitutional infirmities that felled Act 44. Specifically, Act 41 purports to transform the Joint Underwriting Association into a governmental entity housed

within the Commonwealth's Insurance Department ("Department") and operating

under the control and oversight of the Commonwealth's Insurance Commissioner

("Commissioner").  It also seeks to accomplish indirectly what JUA I forbade the

state from doing directly—forcing the transfer of the Association's assets to the

Department.  By order of July 18, 2018, we preliminarily enjoined enforcement of

Act 41 pending merits review of the Joint Underwriting Association's constitutional

claims.  The parties' cross-motions for summary judgment are now before the court.

## I.   <u>Factual Background & Procedural History</u>[1]

The factual backdrop of this litigation is outlined *in extenso* in this court's

summary judgment opinion in JUA I and our preliminary injunction opinion in this

action, familiarity with which is presumed.  <u>See</u> <u>generally</u> JUA I, 324 F. Supp. 3d

519 (M.D. Pa. 2018); <u>Pa. Prof'l Liab. Joint Underwriting Ass'n v. Wolf</u> ("<u>JUA II</u>"), 328

F. Supp. 3d 400 (M.D. Pa. 2018).  We reiterate salient facts for context in addressing

the parties' Rule 56 arguments.

### A.    The Joint Underwriting Association

The Joint Underwriting Association was established by statute as a nonprofit

association organized under the laws of the Commonwealth of Pennsylvania.  The

---

[1] Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried."  LOCAL RULE OF COURT 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried.  <u>Id.</u>  Unless otherwise noted, the factual background herein derives from the parties' Rule 56.1 statements of material facts.  (<u>See</u> Docs. 33, 38, 41, 45, 52, 55, 56, 58).  To the extent the parties' statements are undisputed or supported by uncontroverted record evidence, the court cites directly to the statements of material facts.

General Assembly created the Association in 1975 in response to a decline in the availability of medical malpractice insurance in the Commonwealth. (Doc. 33 ¶ 3). The Association was initially established and organized by the Pennsylvania Health Care Services Malpractice Act of 1975, P.L. 390, No. 111 (the "CAT Fund Statute").

The CAT Fund Statute authorized the Commissioner to either "establish and implement" or "approve and supervise" a "plan" for ensuring that medical professional liability insurance is made "conveniently and expeditiously" available to providers in the Commonwealth who cannot obtain insurance on the open insurance market. See CAT Fund Statute, § 801 (codified prior to repeal at 40 PA. STAT. AND CONS. STAT. ANN. § 1301.801). Section 801 provided that the plan "may be implemented by a joint underwriting association," id., and Section 803 permitted insurers to consult and agree with each other as to "organization, administration and operation of the plan" and rates for coverage, id. § 803(a) (codified prior to repeal at 40 PA. STAT. AND CONS. STAT. ANN. § 1301.803). An "Ad Hoc Industry Committee" of insurers submitted the Joint Underwriting Association's original proposed plan of operations to the then-Commissioner, who approved same on December 30, 1975. (Doc. 33 ¶¶ 7-8). The plan established a 12-member board of directors, one member of which was appointed by the Commissioner, and vested authority in the board to "decide all matters of policy and have authority to exercise all reasonable and necessary powers relating to the operation of the Association which are not specifically delegated by the plan to others or reserved to members of the Association." (Id. ¶¶ 9, 11). The statute authorized the Commissioner to dissolve the plan if he deemed it unnecessary and authorized the Association to

borrow funds from the state in the event of a deficit.  CAT Fund Statute, §§ 803(b),

808 (codified prior to repeat at 40 PA. STAT. AND CONS. STAT. ANN. §§ 1301.803(b), -

.808).  The Association was granted Section 501(c)(6) status by the Internal Revenue

Service in 1976 and has since maintained that status.  (Doc. 33 ¶¶ 12-14).

The General Assembly repealed the CAT Fund Statute on March 20, 2002,

replacing it with the current statutory framework, the Medical Care Availability

and Reduction of Error Act ("MCARE Act"), 40 PA. STAT. AND CONS. STAT. ANN.

§ 1303.101 *et seq.*  The MCARE Act is a sweeping piece of legislation, with an

overarching goal of ensuring a "comprehensive and high-quality health care

system" for the citizens of the Commonwealth.  Id. § 1303.102(1).  Among other

things, the MCARE Act establishes the Medical Care Availability and Reduction of

Error Fund ("the MCARE Fund"), id. §§ 1303.711-.716, as a "special fund" within

the state treasury to be administered by the Department, id. §§ 1303.712(a), -.713(a).

The Fund offers a secondary layer of medical professional liability coverage for

physicians, hospitals, and other health care providers and is funded primarily by

annual assessments on those providers as a condition to practice in the

Commonwealth.  See id. § 1303.712(d)(1).

The MCARE Act continued operation of the Joint Underwriting Association.

Id. § 1303.731(a).  Unlike the MCARE Fund, the Association was not established as

a "special fund" or a traditional agency within the Commonwealth's governmental

structures.  See id.; cf. id. §§ 1303.712(a), -.713(a).  Instead, the General Assembly

"established" the Association as "a nonprofit joint underwriting association to be

known as the Pennsylvania Professional Liability Joint Underwriting Association."

Id. § 1303.731(a).  Like its predecessor, the MCARE Act mandates membership in the Association for insurers authorized to write medical professional liability insurance in the Commonwealth.  Id.

The MCARE Act requires the Association to offer medical professional liability insurance to health care providers and entities who "cannot conveniently obtain medical professional liability insurance through ordinary methods at rates not in excess of" rates applicable to those similarly situated.  Id. § 1303.732(a).  The Act sets forth broad parameters for achieving this objective, tasking the Association to ensure that its insurance is conveniently and expeditiously available, offered on reasonable and not unfairly discriminatory terms, and subject only to the payment of a premium for which payment plans must be made available.  Id. § 1303.732(b)(1)-(5).  The MCARE Act prescribes four "duties" for the Association.  Id. § 1303.731(b).  It requires the Association to (1) submit a plan of operations to the Commissioner for approval, (2) submit rates and any rate modifications for Department approval, (3) offer insurance as described *supra*, and (4) file its schedule of occurrence rates with the Commissioner.  See id. § 1303.731(b)(1)-(4).

The Association, like other insurers licensed to operate within the Commonwealth, is "supervised" by the Department through the Commissioner.  Id. § 1303.731(a); see, e.g., id. §§ 221.1-a to -.15-a, 1181-99.  The MCARE Act otherwise provides that all "powers and duties" of the Association "shall be vested in and exercised by a board of directors."  Id. § 1303.731(a).  The board's composition, and all of the Association's operative principles, are set forth in a plan of operations developed by the Association with Department assistance and approval.  (See Doc.

33 ¶¶ 38-41); <u>JUA I</u>, 324 F. Supp. 3d at 536. The existing plan establishes a 14-member board of directors, which consists of the current Association president; eight representatives of member companies chosen by member voting; one agent or broker elected by members; and four health care provider or general public representatives who may be nominated by anyone and are appointed by the Commissioner. (Doc. 33 ¶ 38). Under the plan, the Association may be dissolved (1) "by operation of law" or (2) at the request of its members, subject to Commissioner approval. (<u>Id.</u> ¶ 40). The plan provides that, "[u]pon dissolution, all assets of the Association, from whatever source, shall be distributed in such manner as the Board may determine subject to the approval of the Commissioner." (<u>Id.</u> ¶ 41).

The Joint Underwriting Association writes insurance policies directly to its insured health care providers, and those policyholders pay premiums directly to the Association. (<u>See</u> <u>id.</u> ¶ 52). The Association is funded exclusively by policyholder premiums and investment income generated therefrom. (<u>Id.</u> ¶¶ 46, 49, 50-51). It is not and has never been funded by the Commonwealth, (<u>id.</u> ¶ 49), and it has historically held all premiums and investment funds in private accounts in its own name, (Doc. 41 ¶¶ 8-9; Doc. 52 ¶¶ 8-9; <u>see</u> <u>also</u> Doc. 58 ¶¶ 8-9). Prior to enactment of Act 41, the MCARE Act insulated the Commonwealth from the Association's debts and liabilities. <u>See</u> 40 PA. STAT. AND CONS. STAT. ANN. § 1303.731(c); (Doc. 33 ¶ 32). The Association has never borrowed money to fund its operations, either in its current form or under the CAT Fund Statute which authorized the Association to borrow from the state. (Doc. 33 ¶¶ 19, 50). In the event of a deficit, the Association's plan of operations contemplates assessments on members in the form of a loan as

one method of keeping the Association afloat.  (See Doc. 33-6 at 3).  The Association

has never assessed its members under this provision.  (Doc. 33 ¶ 46).

The Association maintains contingency funds—its "reserves" and its

"surplus"—which allow the Association to fulfill its insurance obligations in the

event of greater-than-anticipated claims or losses.  See JUA I, 324 F. Supp. 3d at

525-26; (see also Doc. 33 ¶¶ 60, 62, 64, 72-74).  An insurer's "reserves" are the "best

estimate of funds . . . need[ed] to pay for claims that have been incurred but not yet

paid."  (See Doc. 33 ¶ 72).  Its "surplus" represents "capital after all liabilities have

been deducted from assets."  (See id. ¶ 73).  The surplus operates as a "backstop" to

ensure that unforeseen events do not impede an insurer's ability to meet obligations

to its insureds.  (See id. ¶ 74).  As of December 31, 2016, the Joint Underwriting

Association maintained a surplus of $268,124,502.  (Id. ¶ 58).

### B.      Recent Legislative Acts Concerning the Association

On July 13, 2016, Governor Wolf signed into law Act 85 of 2016, P.L. 664, No.

85 ("Act 85") (codified prior to repeal at 72 PA. STAT. AND CONS. STAT. ANN. § 1726-C).

Act 85 is wide-ranging in scope, but its principal effect was to amend the General

Appropriation Act of 2016 and balance the Commonwealth's budget.  Act 85, § 1.

Among other things, Act 85 provided for certain transfers to the Commonwealth's

General Fund.  See id. § 1(7).  Pertinent here, Section 18 of Act 85 amended the

Commonwealth's Fiscal Code to require a $200,000,000 transfer to the General Fund

from the Joint Underwriting Association, repayable over a five-year period that was

to begin in July 2018.  Id. § 18.

The Association did not transfer funds to the Commonwealth pursuant to Act 85.  (Doc. 33 ¶ 93).  On May 18, 2017, the Association commenced a lawsuit, also pending before the undersigned, challenging the constitutionality of Act 85.  See Pa. Prof'l Liab. Joint Underwriting Ass'n v. Albright, No. 1:17-CV-886, Doc. 1 (M.D. Pa. May 18, 2017).  At the parties' request, that litigation has been held in abeyance pending resolution of appeals filed in JUA I.

On October 30, 2017, Governor Wolf signed Act 44 into law in another attempt to bring balance to the state budget.  Act 44, § 1.  Therein, the General Assembly expressly repealed Act 85.  Id. § 13.  Act 44, *inter alia*, purported to amend the Commonwealth's Fiscal Code to include certain "findings" concerning the Joint Underwriting Association's relationship to the Commonwealth and the nature of its unappropriated surplus.  Id. § 1.3.  Specifically, the General Assembly "found" that the Association is an "instrumentality of the Commonwealth" and "[m]oney under the control of the [Association] belongs to the Commonwealth."  Id.  Act 44 then mandated a monetary transfer from the Association to the state—$200,000,000 to the State Treasurer for deposit in the General Fund—for appropriation to the Department of Human Services.  Id.  Act 44 contained a "sunset" clause threatening to abolish the Association if it failed to make the transfer.  Id.

The Association responded with a second lawsuit, JUA I, challenging the constitutionality of Act 44.  We preliminarily enjoined enforcement of Act 44 and accelerated proceedings on the merits of the Association's claims.  JUA I, No. 1:17-CV-2041, 2017 WL 5625722 (M.D. Pa. Nov. 22, 2017).  On May 17, 2018, we

issued a memorandum opinion concluding that the Association is a private entity and its surplus funds are private property that the Commonwealth cannot take without just compensation. JUA I, 324 F. Supp. 3d at 538. We entered judgment in favor of the Association, declaring Act 44 to be violative of the Fifth Amendment and permanently enjoining enforcement of the provisions thereof relevant to the Association. Both the Commonwealth and the General Assembly appealed our judgment to the Third Circuit Court of Appeals. See Pa. Prof'l Liab. Joint Underwriting Ass'n v. Wolf, No. 18-2323 (3d Cir.). The appeals remain pending.

On June 22, 2018, Governor Wolf signed into law the legislation subject to this lawsuit. Act 41 is the General Assembly's third attempt in as many years to gain access to the Association's funds. The Act endeavors to fundamentally reshape the Joint Underwriting Association and alter its governance structure to give the Commonwealth direct control of the Association's assets and operations. See Act 41, §§ 3-5. Specifically, Act 41 does the following:

(1) Finds that "placing the Association within the Department will give the Commissioner more oversight of expenditures and ensure better efficiencies in the operation of the Association";

(2) Declares that the Association "shall continue as an instrumentality of the Commonwealth" and "shall operate under the control, direction and oversight of the Department";

(3) Replaces the Association's current member-led board with a state-controlled board, consisting of three gubernatorial appointees and one member appointed by each of the president *pro tempore* and the minority leader of the Pennsylvania Senate and the speaker and the minority leader of the Pennsylvania House of Representatives, with the chair of the board to be appointed by the Governor;

(4)     Installs a new executive director to be hired by the Commissioner and compensated by the Commonwealth, to whom authority to act on behalf of the Association will be transferred within 30 days of the Act's effective date;

(5)     Assumes Commonwealth liability for any claims or liabilities of the Association arising under its insurance policies;

(6)     Mandates that the new board prepare and submit a new plan of operations to the Commissioner for approval within 60 days of the Act's effective date;

(7)     Articulates with specificity the duties and responsibilities of and the authority granted to the new board; and

(8)     Provides that all documents, papers, and assets in the Association's possession shall be transferred to the Department within 30 days of the Act's effective date.

Id. § 3.  Act 41 was scheduled to take effect on July 22, 2018.  Id. § 7.

## C.     Procedural History

The Joint Underwriting Association commenced this lawsuit with the filing of a verified complaint on June 28, 2018, subsequently filing an amended complaint on July 3, 2018.  Therein, the Association challenges the constitutionality of Act 41 under 42 U.S.C. § 1983.  The Association asserts that Act 41 violates the Substantive Due Process Clause (Count I), the Takings Clause (Count II), and the Contract Clause (Count III).  It seeks declaratory and injunctive relief pursuant to Section 1983 and the Declaratory Judgment Act, 28 U.S.C. § 2201 (Count IV).  The amended complaint identifies two groups of defendants: Tom Wolf, Governor of the Commonwealth, and Jessica K. Altman, Insurance Commissioner of Pennsylvania, whom we will refer to as the "executive defendants," and a group we refer to as the "legislative defendants," comprising Joseph B. Scarnati, President *Pro Tempore* of

the Senate; Jay Costa, Minority Leader of the Senate; Michael Turzai, Speaker of the House of Representatives; and Frank Dermody, Minority Leader of the House of Representatives.[2]  All defendants are sued in their official capacities.

The Association moved for a temporary restraining order and preliminary injunction contemporaneously with the commencement of this case.  We denied the request for temporary restraining order and expedited proceedings on the request for a preliminary injunction.  Following oral argument on July 6, 2018, we granted the Association's motion and preliminarily enjoined enforcement of Act 41 pending merits review of the Association's claims.  <u>See</u> <u>generally</u> <u>JUA II</u>, 328 F. Supp. 3d 400.  Cross-motions for summary judgment filed by the Joint Underwriting Association, the executive defendants, and the legislative defendants are ripe for disposition.

## II.  <u>Legal Standard</u>

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact" and for which a jury trial would be an empty and unnecessary formality.  FED. R. CIV. P. 56(a).  The burden of proof tasks the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief.

---

[2] The amended complaint also names the General Assembly of the Commonwealth of Pennsylvania as a defendant.  The General Assembly waived service, rendering its answer due by August 27, 2018.  (Doc. 16).  To date, counsel has not entered an appearance on behalf of the General Assembly and no answer has been filed on its behalf.  All filings by the legislative defendants have been made solely under the names of the four individual elected leaders and cannot be fairly construed as having been filed on behalf of the General Assembly itself.

Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986).  Only if this threshold is met may the cause of action proceed.  See Pappas, 331 F. Supp. 2d at 315.

Courts are permitted to resolve cross-motions for summary judgment concurrently.  See Lawrence v. City of Phila., 527 F.3d 299, 310 (3d Cir. 2008); see also Johnson v. Fed. Express Corp., 996 F. Supp. 2d 302, 312 (M.D. Pa. 2014); 10A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2720 (3d ed. 2015).  When doing so, the court is bound to view the evidence in the light most favorable to the non-moving party with respect to each motion.  FED. R. CIV. P. 56; Lawrence, 527 F.3d at 310 (quoting Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968)).

## III.    Discussion

The Joint Underwriting Association raises four claims in its amended complaint.  The Association asserts *first*, that Act 41 violates its right to substantive due process; *second*, that Act 41 is an unconstitutional taking of private property; *third*, that Act 41 substantially interferes with the Association's contracts with its insureds and its members; and *fourth*, that it is entitled to a declaration that Act 41 is unconstitutional for each of the above reasons pursuant to the Declaratory

Judgment Act, 28 U.S.C. § 2201.  As in <u>JUA I</u>, we begin and end our analysis with the Association's Takings Clause claim.

### A.    The Association's Takings Clause Claim

Section 1983 of Title 42 of the United States Code creates a private cause of action to redress constitutional wrongs committed by state officials.  42 U.S.C. § 1983.  The statute is not a source of substantive rights, but serves as a mechanism for vindicating rights otherwise protected by federal law.  <u>Gonzaga Univ. v. Doe</u>, 536 U.S. 273, 284-85 (2002); <u>Kneipp v. Tedder</u>, 95 F.3d 1199, 1204 (3d Cir. 1996).  To state a Section 1983 claim, plaintiffs must show a deprivation of a "right secured by the Constitution and the laws of the United States . . . by a person acting under color of state law."  <u>Kneipp</u>, 95 F.3d at 1204 (quoting <u>Mark v. Borough of Hatboro</u>, 51 F.3d 1137, 1141 (3d Cir. 1995)).  Defendants do not dispute that they are state actors.  We must thus determine whether Act 41 deprives the Association of rights secured by the Fifth Amendment to the United States Constitution.

We have previously articulated the fundamental principles of takings law, <u>see</u> <u>JUA I</u>, 324 F. Supp. 3d at 528-29, and those principles have equal application here.  The Takings Clause of the Fifth Amendment prohibits the government from taking private property for public use without just compensation.  U.S. CONST. amend. V.  The Takings Clause is made applicable to the states by the Fourteenth Amendment.  <u>See</u> U.S. CONST. amend. XIV; <u>Murr v. Wisconsin</u>, 582 U.S. __, 137 S. Ct. 1933, 1942 (2017) (citing <u>Chi., B. & Q. R. Co. v. Chicago</u>, 166 U.S. 266 (1897)).  It

applies not only to the taking of real property, but also to government efforts to take identified funds of money. See, e.g., Phillips v. Wash. Legal Found., 524 U.S. 156, 160, 164-65 (1998); Webb's Fabulous Pharms., Inc. v. Beckwith, 449 U.S. 155, 164-65 (1980). Takings claims generally fall into two categories—physical and regulatory. See Yee v. City of Escondido, 503 U.S. 519, 522-23 (1992).

Our decision in JUA I applied these settled principles in the context of the unique constitutional question then before us. Because the parties' summary judgment motions concenter upon JUA I, we briefly revisit the *ratio decidendi* undergirding that decision.

      1.    **JUA I**

JUA I rejected arguments by Governor Wolf and the General Assembly that the Joint Underwriting Association is either the state itself or an arm thereof with no constitutional rights against its creator. We found Governor Wolf's reliance on the United States Supreme Court's decision in Lebron v. National Railroad Passenger Corp., 513 U.S. 374 (1995), which supplied "guideposts" for courts to assess whether a defendant is a government actor subject to Section 1983 liability, to be misplaced. JUA I, 324 F. Supp. 3d at 531-32. And we disagreed with the General Assembly that, by virtue of its statutory roots, the Association is akin to a political subdivision with "no privileges or immunities" against its state creator. Id. at 530-32 (quoting Williams v. Mayor of Balt., 289 U.S. 36, 40 (1933)).

Drawing on a body of illustrative federal and state court decisions,[3] we observed that courts typically look to a number of nonexhaustive considerations in assessing the public-versus-private nature of state-affiliated insurance associations, including "the nature of the association's function, the degree of control reserved in the state (or the level of autonomy granted the association), and the statutory treatment, if any, of the entity, in addition to the nature of the funds implicated." Id. at 535. We carefully examined the Association's enabling legislation, the nature of the Association's function and the manner in which it performed that function, its governance and operational structure, the relative lack of Commonwealth control and the total dearth of Commonwealth responsibility, and the private source of the Association's funds before holding that both the Association and its assets are overwhelmingly private in nature. Id. at 535-38.

As to the Association itself, we determined that it is "at its core, an insurance company," funded exclusively by privately-paid premiums and largely indistinguishable from other private insurers in the Commonwealth. Id. at 535-36. Of greater import than the Association's function was its near-total independence from the state. We rejected defendants' assertion that the Commonwealth retained authoritative control over the Association, observing that the MCARE Act vested all

_____

[3] Those decisions are Mississippi Surplus Lines Ass'n v. Mississippi, 261 F. App'x 781 (5th Cir. 2008) (nonprecedential), Asociación de Subscripción Conjunta del Seguro de Responsabilidad Obligatorio v. Flores Galarza, 484 F.3d 1 (1st Cir. 2007), Arroyo-Melecio v. Puerto Rican American Insurance Co., 398 F.3d 56 (1st Cir. 2005), Texas Catastrophe Property Insurance Ass'n v. Morales, 975 F.2d 1178 (5th Cir. 1992), Medical Malpractice Insurance Ass'n v. Cuomo, 541 N.E.2d 393 (N.Y. 1989), and Medical Malpractice Insurance Ass'n v. Superintendent of Insurance, 533 N.E.2d 1030 (N.Y. 1988). We reexamine several of these decisions in detail infra.

"powers and duties" of the Association "in and [to be] exercised by" its member-led board of directors. Id. (alteration in original) (quoting 40 PA. STAT. AND CONS. STAT. ANN. § 1303.731(a)). We found that a limitation on rate-setting and a requirement that the Commissioner approve deficits were not meaningfully distinguishable from regulations applicable to other private insurers in the Commonwealth. Id. at 536-37. And we noted that it was not the MCARE Act but the Association's own plan of operations which set procedures for dissolution. Id. at 537. Hence, we held that the Association is no more a Commonwealth entity "than any other private insurer authorized to write insurance in the state." Id.

Turning to the nature of the Association's surplus funds, we noted that the Association has never received public funding and that the MCARE Act (as it then-existed) expressly disclaimed state responsibility for the Association's debts and liabilities. Id. at 537-38 (citing 40 PA. STAT. AND CONS. STAT. ANN. § 1303.731(c)). We also underscored that the Association is sustained exclusively by private premiums, "paid by private parties in exchange for private insurance coverage," as well as investment income and interest generated on those premiums. Id.

For these many reasons, we held as a matter of law that the Joint Underwriting Association is a private entity and that its surplus funds are private property. Id. at 538. We observed that the Commonwealth made a choice when it created the Association in 1975, and that its choice has present-day constitutional consequences:

> The legislature had the option to tightly circumscribe
> the Association's operations and composition of its board,
> to establish the Association as a special fund within the

> state's treasury, or to retain meaningful control in any
> number of other ways. That the General Assembly chose
> to achieve a public health objective through a private
> association has a perceptible benefit: it assures availability
> of medical professional liability coverage throughout the
> Commonwealth at no public cost. By the same token, it
> also has a consequence: the General Assembly cannot
> claim *carte blanche* access to the Association's assets.

Id. (citations omitted). The result, we said, is that the Commonwealth cannot take

private property acquired by the Association without just compensation. Id.

The *essentia* of our holding in JUA I is that the state "released the

Association from any residual sovereign mooring" when it relinquished control of

the Association to the board and disclaimed responsibility therefor. JUA II, 328 F.

Supp. 3d at 410 (quoting JUA I, 324 F. Supp. 3d at 538). The question raised in the

matter *sub judice* is whether the Commonwealth, through Act 41, can reclaim the

Association as a purely governmental entity and gain access to its surplus funds.

The Association asks the court to assign *res judicata* effect to our judgment in JUA

I and answer this inquiry in the negative. Defendants rejoin that the answer is an

unequivocal "yes," insisting that the court either reconsider and abandon JUA I or

find it to be distinguishable given the new statutory landscape brought by Act 41.

### 2. *Issue Preclusion*

The Joint Underwriting Association invokes the doctrine of issue preclusion,

also referred to as collateral estoppel. Federal law of issue preclusion derives from

the Restatement (Second) of Judgments, which provides that "[w]hen an issue of

fact or law is actually litigated and determined by a valid and final judgment, and

the determination is essential to the judgment, the determination is conclusive in a

subsequent action between the parties, whether on the same or a different claim." B & B Hardware, Inc. v. Hargis Indus., Inc., 575 U.S. __, 135 S. Ct. 1293, 1303 (2015) (quoting RESTATEMENT (SECOND) OF JUDGMENTS § 27 (AM. LAW INST. 1980)); Nat'l R.R. Passenger Corp. v. Pa. Pub. Util. Comm'n, 288 F.3d 519, 525 (3d Cir. 2002) (same). Four elements are prerequisite to application of issue preclusion: "(1) the identical issue was previously adjudicated; (2) the issue was actually litigated; (3) the previous determination was necessary to the decision; and (4) the party being precluded from relitigating the issue was fully represented in the prior action."[4] Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc., 458 F.3d 244, 249 (3d Cir. 2006) (citation omitted). The Third Circuit has also considered two additional elements, to wit: "whether the party being precluded 'had a full and fair opportunity to litigate the issue in question in the prior action,'" and "whether the issue was determined by a final and valid judgment." Id.

The Joint Underwriting Association contends that resolution of the dispositive issue in this case begins and ends with JUA I. But collateral estoppel generally will not apply when "controlling facts or legal principles have changed significantly since the [prior] judgment." Karns v. Shanahan, 879 F.3d 504, 514 (3d Cir. 2018) (alteration in original) (quoting Montana v. United States, 440 U.S. 147,

---

[4] The executive defendants articulate a somewhat different formulation, quoting from the Third Circuit's decision in Gregory v. Chehi, 843 F.2d 111, 122 (3d Cir. 1988). (Doc. 57 at 3-4). The court in Gregory was applying Pennsylvania law to determine the preclusive effect of a Pennsylvania state court judgment. Id. at 116, 122. Because JUA I is a federal court decision on a federal question, we apply federal law of preclusion. See Doe v. Hesketh, 828 F.3d 159, 171 (3d Cir. 2016) (citing Paramount Aviation Corp. v. Agusta, 178 F.3d 132, 145 (3d Cir. 1999)).

155 (1979)).  We are here presented with a different legislative act and a different constitutional question than were before us in JUA I.  At issue there was whether the Joint Underwriting Association was a public or private entity, and whether its funds were public or private property.  See JUA I, 324 F. Supp. 3d at 529-38.  We held that both the Association and its funds were private in nature and that the state could not take those funds without just compensation.  See id. at 538.

The issue now before the court is different.  As we have already framed it, the dispositive inquiry is "[w]hether the Commonwealth can now recapture the Association through *post hoc* legislation—irrespective of private rights and interests accrued by the Association over more than four decades"—without constitutional consequence.  See JUA II, 328 F. Supp. 3d at 410-11.  Our disposition of the Fifth Amendment issue raised by Act 41 is assuredly informed by JUA I.  And many of the same constitutional concerns are implicated by this newest legislation.  But the enactment of Act 41 alters the legal landscape, compelling scrutiny anew.  Accordingly, we cannot find that the issues raised in JUA I are "identical" to the issues presently before the court.

### 3.    *Merits*

We turn to the merits and begin from a simple premise: the Association, as it existed on May 17, 2018, is a private entity, and its funds are private property that cannot be taken by the government without just compensation.  See JUA I, 324 F. Supp. 3d at 538.  From there, the parties' arguments take three divergent tacks. The executive defendants contend that Act 41 merely complies with JUA I by implementing criteria set forth therein to reconstitute the Association as a public

entity. The legislative defendants assert that the holding in <u>JUA I</u> is in error, that the Joint Underwriting Association is a public entity in which the Commonwealth alone is interested, and that the state can do with the Association what it pleases. And the Association maintains that Act 41, like its predecessor Act 44, effects an unconstitutional taking of its private property. The court addresses each argument *seriatim*.

### a.     <u>Executive Defendants: Answering JUA I</u>

The executive defendants rely on Act 41 itself as the answer to the constitutional inquiry before the court. They remonstrate that Act 41 checks each of the boxes drawn by <u>JUA I</u> to transform the Association into a Commonwealth entity. (<u>See</u> Doc. 44 at 6-11). They answer the court's inquiry of whether the state can retrospectively recapture a private entity and assume ownership of its private property with a firm but wholly unsupported "yes." (<u>Id.</u> at 6-9).

We expressed skepticism at the preliminary injunction stage with respect to this contention, which we construed as intimating that "with a legislative vote and the stroke of the Governor's pen, what were private funds yesterday may become public funds tomorrow." <u>JUA II</u>, 328 F. Supp. 3d at 410. We further observed that, notwithstanding the "wide leeway" rightly accorded to legislative prerogative, the executive defendants had offered no jurisprudential support for their claim that the Commonwealth could transfigure into public property what the court had already declared to be private. <u>Id.</u> at 410 (quoting <u>Holt Civic Club v. City of Tuscaloosa</u>, 439 U.S. 60, 71 (1978)).

The executive defendants offer no meaningful response to our expressed concerns. They move through the components parts of Act 41, explaining how each "answers" and satisfies the public-entity hallmarks found to be lacking in JUA I. (See Doc. 44 at 6-9). But they fail to provide any authority for the proposition that the state can declare public what it created as—and a court has confirmed to be—a private entity. The law is to the contrary. Indeed, the Supreme Court's takings jurisprudence expressly rejects the suggestion that the state, by legislative say-so, may make public what was previously private, admonishing that "a State, by *ipse dixit*, may not transform private property into public property without just compensation." Webb's Fabulous Pharms., Inc., 449 U.S. at 164. Accordingly, we will deny the executive defendants' motion for summary judgment on the Joint Underwriting Association's takings claim.

### b.  **Legislative Defendants: Revisiting JUA I**

The legislative defendants do not engage with the constitutionality of Act 41 directly. They approach this case similarly to JUA I, reviving their assertion that the General Assembly created the Joint Underwriting Association, and that only the Commonwealth is interested in the Association, such that the Association necessarily is a public entity and its funds public property. No change in law, fact, or perspective supports the requested departure from JUA I. It is this court's view that the legislative defendants' assertions of error are most appropriately raised in

the pending direct appeal of JUA I. Nonetheless, for the sake of completeness, we respond to those arguments herein.[5]

The legislative defendants turn first to the Supreme Court's decision in Trustees of Dartmouth College v. Woodward ("Dartmouth"), 17 U.S. (4 Wheat.) 518 (1819), which they claim reinforces their assertion that the General Assembly retains "absolute discretion over the entities it creates." (Doc. 37 at 17). Defendants hold Dartmouth up for their view that a state's power over entities it creates turns exclusively on the "presence or absence of non-state interests." (Id. at 18 (emphasis omitted)). We agree that the existence of non-state interests is to be considered in assessing whether the state may wield its power, unrestrained by the federal Constitution, over an entity. We disagree, however, that this is the only relevant consideration, or that our decision in JUA I in any way conflicts with Dartmouth.

Dartmouth arose under the Contract Clause of the United States Constitution. In 1754, Reverend Eleazer Wheelock established Dartmouth College at his own and other private benefactors' expense, named trustees thereof, and applied to the crown for a charter of incorporation. Id. at 631. The charter was granted and Dartmouth College was born. Id. at 631-32. In 1816, the legislature of

_____

[5] The General Assembly defendants also resurrect their political subdivision standing doctrine argument. Specifically, defendants challenge this court's determination in JUA I that the extension of that doctrine recognized in Pocono Mountain Charter School v. Pocono Mountain School District, 908 F. Supp. 2d 597 (M.D. Pa. 2012), does not apply to an entity like the Joint Underwriting Association which has no municipal characteristics or powers. We again conclude that the relationship between the Commonwealth and the Association is not "sufficiently analogous" to that between a state and its municipalities to support invocation of the political subdivision standing doctrine. We incorporate and reaffirm our analysis in JUA I on this subject. See JUA I, 324 F. Supp. 3d at 530-31.

New Hampshire attempted to amend the charter to seize control of the college as a public institution.  See id. at 626-27.  The Dartmouth lawsuit followed.

The Supreme Court rejected the attempted takeover as a violation of the Contract Clause.  The decision establishes that the United States Constitution does not bar the state from regulating its own public institutions but *does* protect private corporations as against the state.  See id. at 630-31, 638.  Whether an entity is a public or private institution turns not on the commercial or charitable nature of the services provided, see id. at 669-73 (Story, J., concurring), but on the entity's status *vel non* as an "instrument[] of government," see id. at 638 (Marshall, C.J.).  The Court stated that a government charter is a "grant of political power" and establishes a public entity "if it create a civil institution, to be employed in the administration of the government, or if the funds of the [entity] be public property, or if the state . . . , as a government, be alone interested in its transactions."  Id. at 629-30.  Where it creates such an institution, the government "may act according to its own judgment, unrestrained by any limitation of its power imposed by the constitution of the United States."  Id. at 630.

Concurring justices endeavored to put a finer point on the distinction.  Justice Washington compared governmental entities, which he described as "the mere creature of public institution, created exclusively for the public advantage, without other endowments than such as the king, or government, may bestow upon it, and having no other founder or visitor than the king or government," with private institutions, those "endowed and founded by private persons, and subject to their control, laws and visitation, and not to the general control of the government."

Id. at 661 (Washington, J., concurring). Justice Story added that a public entity exists solely for a "public purpose[]" and "its whole interests and franchises are the exclusive property and domain of the government itself." Id. at 668-69, 672 (Story, J., concurring). By contrast, he said, where "the foundation be private, though under the charter of the government, the corporation is private." Id. at 668-69.

The legislative defendants posit that the Joint Underwriting Association is precisely the governmental instrument contemplated by Dartmouth, maintaining that the Commonwealth and only the Commonwealth is interested in its business. (Doc. 53 at 8). But as three lawsuits, more than a thousand pages of briefing, and multiple judicial opinions evince, the constitutional question *sub judice* is quite different from that presented in Dartmouth. Yes, the General Assembly did create the Association in response to a medical malpractice insurance crisis in the Commonwealth. But in the same act that created the Association, the legislature relinquished near-total control thereof and renounced responsibility therefor, establishing the Association as a nonprofit with its own statutory rights, disclaiming liability for its debts and obligations, and vesting all powers and duties in its member-led board. See JUA I, 324 F. Supp. 3d at 536. We discern no tension between Dartmouth and JUA I. The Association does not neatly fit into any of the categories of public entities described in Dartmouth: it is not, as defendants submit, "a civil institution . . . employed in the administration of the government"; it has never been funded by or endowed with "public property"; and the state has never been "alone interested in its transactions." See Dartmouth, 17 U.S. (4 Wheat.) at 629-30.

It is for this reason that we looked to other cases involving constitutional claims brought by state-created insurance associations. The legislative defendants also oppugn our assessment of those opinions, which included the Fifth Circuit's decision in <u>Texas Catastrophe Property Insurance Ass'n v. Morales</u>, 975 F.2d 1178 (5th Cir. 1992); the First Circuit's decisions in <u>Asociación de Subscripción Conjunta del Seguro de Responsabilidad Obligatorio v. Flores Galarza</u>, 484 F.3d 1 (1st Cir. 2007), and <u>Arroyo-Melecio v. Puerto Rican American Insurance Co.</u>, 398 F.3d 56 (1st Cir. 2005); and the New York Court of Appeals' decision in <u>Medical Malpractice Insurance Ass'n v. Superintendent of Insurance</u> ("<u>MMIA</u>"), 533 N.E.2d 1030 (N.Y. 1988). In each of those cases, we determined, the courts "holistically examined the entity's relationship to the state," by examining such considerations as the "nature of the association's function, the degree of control reserved in the state (or the level of autonomy granted to the association), and the statutory treatment, if any, of the entity, in addition to the nature of the funds implicated." <u>JUA I</u>, 324 F. Supp. 3d at 535 (citations omitted).

The legislative defendants asseverate that these cases stand, at most, for the proposition that "a state-created entity may *sometimes* assert constitutional claims on behalf of private citizens," but only when the individual rights of those private citizens are themselves implicated. (Doc. 37 at 24 (emphasis added)). For example, in <u>Morales</u>, the Fifth Circuit held that the statutorily-established Texas Catastrophe Property Insurance Association (CATPOOL) was not in fact "part of the state" and had standing to sue Texas for deprivation of its right to counsel. <u>See</u> <u>Morales</u>, 975 F.2d at 1182-83. In <u>Asociación</u>, the First Circuit concluded that Puerto Rico's

statutorily-established joint underwriting association could assert a takings claim against the government.  See Asociación, 484 F.3d at 20 (quoting Arroyo-Melecio, 398 F.3d at 62).  Defendants assert that these results obtained solely because member companies shared in the respective associations' profits and losses, such that the state alone was not interested in the associations' success or failure.  (Doc. 53 at 12-14).  According to defendants, the Constitution protected the "private interests" of the associations' members but did not protect the insurance associations themselves.  (Id. at 12).

We disagreed with defendants' narrow characterization of these decisions in JUA I, and we do so again now.  The Morales court did note that CATPOOL's members shared in its profits and losses.  Morales, 975 F.2d at 1182-83.  But it *also* observed, as we did in JUA I, that the state treasury was not liable for CATPOOL's debts or losses; that the state chose not to fund CATPOOL with taxpayer dollars and had elected not to organize and control it within the state government itself; and that the nature of the funds in question was entirely private, to wit: "private money directed to pay private claims."  Id.  Channeling Dartmouth, the Morales court concluded that "[t]he act creating CATPOOL is not a 'grant of political power,' as in the case of a municipality or other political subdivision," nor is CATPOOL "'employed in the administration of the government.'" Id. at 1183 (citing Dartmouth, 17 U.S. (4 Wheat.) at 629-30).  The court held that CATPOOL was not "truly a part of the state" and thus possessed and could sue for violation of its right to counsel.  Id.

The First Circuit reasoned similarly in determining that Puerto Rico's statutorily-created joint underwriting association is private in nature and has standing to assert a constitutional claim against its creator.  See Asociación, 484 F.3d at 20 (citing Arroyo-Melecio, 398 F.3d at 62).  The court in Asociación drew on its earlier decision in Arroyo-Melecio, an antitrust case, which discussed at length the relationship between the underwriting association and the government.  See id.  The court recognized that the legislature created the association, dictated its form and purpose, exempted the association's profits from income taxes, and held approval power over its operating plan.  See Arroyo-Melecio, 398 F.3d at 61-63.  It nonetheless found that the association was not a governmental entity, highlighting that the association's members, not the government, shared in its profits and losses and bore its insurance risk alone; that the association managed its own affairs; that it had "general corporate powers" to sue and be sued, enter contracts, and hold property; that it was designated by statute as "private in nature, for profit"; and that, although the association was "under some direction by the commonwealth," the commissioner was neither a member of its board nor involved in its "day-to-day affairs."  See id.  Each of these factors, not just member financial interest, informed the First Circuit's conclusion that the association is more akin to an ordinary private insurer than it is part of the state.  See id.  The court accordingly allowed the association to bring a Section 1983 takings claim against government officials.  See Asociación, 484 F.3d at 20 (citing Arroyo-Melecio, 398 F.3d at 62).

Defendants cite to the New York Court of Appeals' decision in MMIA, the only case where a court found that a statutorily-created insurer could not sue the

state. The appeals court looked to the statutory scheme creating New York's

Medical Malpractice Insurance Association ("MMIA") and determined that the

MMIA could not directly assert a takings claim against the superintendent of

insurance. See MMIA, 533 N.E.2d at 1036-37. In reaching that result, the court

underscored many of the same factors that we weighed in JUA I: it noted that the

state and the superintendent of insurance tightly controlled the association[6]; that

the statutory framework comprehensively outlined the association's rights, duties,

and obligations; that the MMIA "may operate only for fixed periods of time" and

only if the superintendent of insurance deemed its function necessary; and that

its "operations are subject to the Superintendent's extensive and direct control."

Id. The court held that the association was part of the state and could not raise

a takings claim. Id.

In closing, the court noted what it was not deciding: whether the regulations

at issue may be confiscatory as to "the individual insurance companies which are

members of MMIA and are required to make up any deficit which may be incurred

---

[6] Defendants note that, when MMIA was decided, the New York statute gave
private insurer members an eight-seat majority on the MMIA board, reserving only
seven seats for state appointees. (Doc. 37 at 27-28). Defendants intimate that the
ceding of control to the insurer members blurs any meaningful distinction between
the Commonwealth's Joint Underwriting Association and New York's MMIA. (Id.)
Defendants misapprehend the court's prior analysis. We observed in JUA I that
the New York statute creating the MMIA "dictat[ed] the composition of its board
and its plan of operation." JUA I, 324 F. Supp. 3d at 534, 536. We did so as part of a
broader analysis contrasting the "exhaustive statutory framework" governing the
MMIA with the skeletal treatment accorded the Association in the MCARE Act. See
id. Our point was not about who controlled the MMIA's board at any given time,
but rather that the New York legislature had dictated the board's composition by
statute (expressly reserving at least some seats for state appointees), whereas the
MCARE Act left the question of board composition to the Association itself.

by MMIA." Id. at 1037. The legislative defendants invoke this afterthought as support for their view that a state-created institution cannot claim constitutional protection against its creator unless it is defending *"individual* property interests" in a representative capacity. (Doc. 53 at 15). We are unpersuaded that the MMIA court intended its *obiter dictum*, offered only after extensive discussion of MMIA's statutory framework and the extensive degree of state control, as the ultimate and singular delimiter of constitutional capacity to sue.[7]

As in JUA I, we again reject the suggestion that a statutorily-created insurance association may bring suit against the state only if the association's members have some personal stake in the entity—and then only on behalf of those members. We simply do not read the applicable authorities as espousing such a rule. Consequently, we maintain our holding from JUA I that a holistic approach, one which thoroughly examines the association's relationship to the state through the prism of, *inter alia*, its function, autonomy, and statutory treatment as well as

---

[7] We note that, even if we were to adopt the legislative defendants' construction that member interest is the lone prerequisite to suit, the record establishes that the Joint Underwriting Association's members *do* have some interest in the Association. The Association is organized as a nonprofit, and, by law, member companies do not share in profits as they did in Asociación and Morales. The Association's reserves and its surplus are its first line of financial defense in the event it suffers a loss. (See Doc. 33 ¶¶ 72-74). But thereafter, it is the Association's member insurance companies, *not* the Commonwealth, that would be held to account: under the Association's current plan of operations, members may be assessed to make up any loss until the Association can borrow sufficient funds to satisfy its deficit, repay borrowed funds, and reimburse members for assessments. (Doc. 33-6 at 3). Although the degree of member interest is not as enduring or direct as the member interest in Asociación and Morales, it is member interest nonetheless and belies defendants' assertion that the state is "alone" interested in the Association.

the nature (including the source) of its funds, best answers whether a statutorily-created nonprofit is private or public for constitutional purposes.

The Joint Underwriting Association, since its inception, has been a private institution. It has operated just like a private insurance company for decades.[8] It is privately funded and organized and has never received public funding. Until Act 41, the Commonwealth explicitly disclaimed any responsibility for the Association's debts and liabilities. The Association covers its own operating expenses and bears its own aggregate insurance risk. Its plan of operations contemplates borrowing and reimbursable member assessments, not state financial support, in the event of a deficit. In stark contrast to MMIA, the Association is subject to minimal supervision by the Commissioner, in a manner not meaningfully different from private insurers. Given all of this, we will deny the legislative defendants' request that we reconsider and abandon our analysis and holding in JUA I.

---

[8] The legislative defendants insist throughout their briefing that the public-private distinction should not be drawn based on "the commercial or charitable nature" of the entity's services. (See, e.g., Doc. 37 at 18-19). Drawing on Justice Story's concurring opinion in Dartmouth for the proposition that state-created entities can include commercial endeavors such as colleges, hospitals, and banks, the legislative defendants urge that "the 'commercial' purpose of a state-created entity does not remove it from [state] control." (Id. at 19 (citing Dartmouth, 17 U.S. (4 Wheat.) at 669 (Story, J., concurring)). To be quite clear, JUA I did not hold that a commercial purpose renders an institution private rather than public. Rather, we determined that an entity's function, and particularly the manner in which it accomplishes that function in relation to the state, is but one factor to consider in assessing public-versus-private status. When we examined the Joint Underwriting Association's function, we considered not only its commercial purpose, but how it effected that purpose, including the source of the funds, where its risk was borne, and its mode of operation anent the state. Each of these elements informed our overall assessment of the Association's relationship to the Commonwealth. We neither held nor intended to imply that the Association is a private entity solely because it engaged in commercial activities.

We lastly address the legislative defendants' suggestion that this court's decision in JUA I conflicts with principles of federalism and deference to state legislative action. Defendants charge that "federal courts should not wield the federal constitution like a ruler, rapping knuckles whenever they disagree with state governance." (Doc. 37 at 16). We agree, as we have at each stage of these lawsuits, that the legislature has wide discretion to experiment with its police powers. The Supreme Court observed as much in Dartmouth, stating that federal courts charged with constitutional review of state legislative acts must approach their task with "cautious circumspection." Dartmouth, 17 U.S. (4 Wheat.) at 625. That deference is not without limitation, however, and federal courts also have an obligation to hear the constitutional cases properly brought before them. See id. As the Supreme Court aptly noted, "however irksome the task may be, this is a duty from which we dare not shrink." Id. Our holdings in JUA I and here today flow not from our disagreement with exercise of legislative prerogative but from what the Fifth Amendment deems to be an unconstitutional abuse thereof.

### c.   The Instant Takings Claim

The only inquiry that remains is whether the Joint Underwriting Association is entitled to judgment as a matter of law on its Takings Clause claim. We conclude that no genuine disputes of material fact persist and that the Association is entitled to summary and declaratory judgment. Act 41 is a repackaged and more intricate version of Act 44. The new legislation endeavors to do indirectly what JUA I told the Commonwealth it could not do directly. The only difference is that Act 41 amplifies its predecessor: where Act 44 purported to take only a portion of the

Association's surplus funds, <u>see</u> Act 44, § 1.3, Act 41 attempts to take all of the Association's assets and to extinguish it as presently—privately—constituted, <u>see</u> Act 41, §§ 3-5.

The executive defendants reprise their argument that Act 41 does not contravene the Fifth Amendment because it does not "take" anything from the Joint Underwriting Association. (Doc. 44 at 9 n.1). They aver that the Association will continue to exist as a statutory entity within the Department, "albeit as a new legislative manifestation," such that "the funds are not being taken by a new owner." (<u>Id.</u>) We rejected this argument at the preliminary injunction stage, and we reject it again now. Act 41 transfers complete control of the Association to the Commonwealth and grants ownership and authority over the Association's assets thereto. The Act dismantles a private entity as it currently exists and transfers its assets *in toto*, as well as its administration, to the Commonwealth. There is, in this court's view, no genuine dispute as to whether Act 41 impermissibly takes the private property of a private entity without just compensation.

We acknowledge that the instant constitutional question is both novel and complex. The General Assembly must be afforded a wide berth to enact and to amend legislation in furtherance of its preferred objectives. But when it chooses to create a private entity to meet those objectives, in which the state is not alone or, indeed, at all interested, and over which the state retains virtually no control, that legislative discretion is bounded by the federal Constitution. This is precisely the case with the Joint Underwriting Association. We hold that the Fifth Amendment prohibits the Commonwealth from taking the private assets of the Association,

32

either directly as in Act 44 or through the hostile takeover effected by Act 41, without just compensation.

### B.      Permanent Injunctive Relief

Before the court may grant permanent injunctive relief, the Joint Underwriting Association must prove: *first*, that it will suffer irreparable injury absent the requested injunction; *second*, that legal remedies are inadequate to compensate that injury; *third*, that balancing of the respective hardships between the parties warrants a remedy in equity; and *fourth*, that the public interest is not disserved by an injunction's issuance.  See eBay, Inc. v. MercExchange, LLC, 547 U.S. 388, 391 (2006) (citations omitted).  Only the executive defendants dispute the remaining prerequisites for a permanent injunction.  The legislative defendants do not address the issue and ostensibly yield the point.  We find permanent injunctive relief to be both appropriate and necessary.

That Act 41 works an immediate and irreparable harm upon the Association is hardly debatable.  And that harm cannot be remedied by monetary damages.  See JUA II, 328 F. Supp. 3d at 411.  As we previously observed, and as the record bears out, Act 41 redoubles the harm of Act 44, "dismantling the Association as presently constituted, ousting its board and president to be replaced by political appointees, and forcing it to transfer *all* of its assets to the Commonwealth."  Id. (citing Act 41, § 3).  Sovereign immunity would foreclose an award of monetary damages in this suit against the Commonwealth, see Edelman v. Jordan, 415 U.S. 651, 663 (1974); Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Human Servs., 730 F.3d

291, 319 (3d Cir. 2013), such that equity alone provides the appropriate remedy, <u>see</u> <u>Temple Univ. v. White</u>, 941 F.2d 201, 214-15 (3d Cir. 1991).

The public interest generally favors vindication of constitutional rights. The executive defendants counter, as they have before, that the public also has a considerable interest in legislative discretion and an unencumbered lawmaking process reflecting the public will.  Defendants proffer no concrete harm (to the government or to the public) beyond this bare assertion.  Their claim of abstract injury to public interest does not outweigh the actual constitutional injury to the Association.  We do not doubt that the legislative and executive defendants had the public interest in mind when enacting Act 41 and continue to act in the name of that interest.  We do not question that the public interest favors a balanced budget and the free and representative exercise of the legislative prerogative.  But as we have stated both in this case and its predecessor, the Commonwealth cannot achieve a legitimate end through unconstitutional means.  <u>See</u> <u>JUA II</u>, 328 F. Supp. 3d at 412; <u>JUA I</u>, 324 F. Supp. 3d at 540.  We will grant the Association's request for permanent injunctive relief.

**IV.** **Conclusion**

The executive defendants assert, and the legislative defendants imply, that our decisions in <u>JUA I</u> and today are "tantamount to holding that the legislative and executive branches are barred from amending . . . legislation related to the [Association]."  (Doc. 57 at 29; <u>see also</u> Doc. 37 at 15-17).  We resolutely disagree. This court does not hold, and has never held, that the General Assembly cannot repeal or amend the statute designating the Association as the state's insurer

of last resort for medical professional liability coverage and assume the task of providing that coverage itself through a special fund within the Department or through a separate entity in which the state and the state alone has an interest. Counsel for the Association concedes that the General Assembly has authority to do all of these things. What happens to the Association and to its private funds at that hypothetical juncture is not before this court. We do not speculate whether the Association might, for example, continue as a private insurer and offer ordinary medical professional liability or other types of insurance. We hold only that the Commonwealth cannot take the Association's private property in the manner contemplated by Act 41.

We reiterate what we observed in closing in <u>JUA I</u>: when it created the Joint Underwriting Association, the General Assembly chose to solve a public health problem through a private, nonprofit association, over which the Commonwealth retained limited control, in which the Commonwealth had no financial interest, and for which the Commonwealth bore no responsibility. The Commonwealth cannot legislatively recapture this private association for the purpose of accessing its assets. The provisions of Act 41 which attempt to accomplish that objective are violative of the Takings Clause of the Fifth Amendment to the United States Constitution.

We will grant summary and declaratory judgment and permanent injunctive relief to the Joint Underwriting Association.  An appropriate order shall issue.


                                        /S/ CHRISTOPHER C. CONNER
                                        Christopher C. Conner, Chief Judge
                                        United States District Court
                                        Middle District of Pennsylvania


Dated:          December 18, 2018